## S90P1043. HAMMOND v. THE STATE.
(398 SE2d 168)

FLETCHER, Justice.

Emmanuel Hammond was convicted by a jury in Fulton County of murder, kidnapping and armed robbery. He was sentenced to death for the offense of malice murder. He now appeals his conviction and death sentence.[1]

The evidence presented at the guilt phase of this trial may be summarized as follows:

Julie Love was last seen by her fiance the morning of July 11, 1988. He called her that evening and she was not in. He left a mes-

---

[1] The crimes occurred in the evening of July 11, 1988 and the early morning hours of July 12, 1988. The defendant was not arrested until August of 1989, and was indicted on September 12, 1989. The case was tried between February 19 and March 8, 1990. The defendant did not file a motion for new trial; he appealed directly to this court. The case was docketed in this court on May 4, 1990. Oral arguments were heard on June 17, 1990.

sage on her answering machine. He left another message the next day. When she did not return his calls, he thought at first that she was "sort of having her way" and "getting back at me a little bit." However, when she failed to return his call the next day he became concerned. He began calling her friends and family and discovered she had not been in touch with any of them either. He went to her apartment that evening with a policeman. She was not home, and they did not feel they had a right to enter her apartment at that time. However, after her car was discovered abandoned and out of gas half a mile from her fiance's house, a formal investigation was begun by the police. The investigation proved fruitless for over a year.

In August of 1989, Janice Weldon, a 34-year-old stripper at an Atlanta lounge and intimate companion of 26-year-old Emmanuel Hammond, had him arrested on charges of aggravated assault after he tried to strangle her. While he was in jail on these charges, Weldon reported to police that Hammond and his cousin Maurice Porter were responsible for the disappearance of Julie Love. Police followed up her report by placing a "body bug" on her and monitoring conversations between her and Maurice Porter. Porter made several incriminating statements, and he and Hammond were arrested. Porter confessed and led police to skeletal remains which were identified by her childhood dentist and next-door neighbor as the mortal remains of Julie Love. Porter and Weldon testified at Hammond's trial.

According to them, Porter, Weldon and Hammond were driving around the evening of July 11, 1988 in Hammond's maroon Oldsmobile Cutlass sedan. They spotted Julie Love walking by the side of Howell Mill Road. At Hammond's command, Porter, the driver, stopped so Hammond could ask her if she wanted a ride. Love answered in the negative, and pointed to a nearby house, claiming she lived there. She walked up the driveway and they drove off. Before they got out of sight, however, Hammond saw her returning to the road. Porter was told to turn around and drive by in the opposite direction, this time with his lights on bright. They drove past Julie Love again and saw farther up the road a car which they correctly deduced was hers. Hammond told Weldon to drive, and they returned to Julie Love. Weldon stopped the car, and Hammond, armed with a sawed-off shotgun, jumped out, grabbed the victim and threw her into the back of the car.

They drove to Grove Park Elementary School (which Hammond had attended). Love's purse was searched and Hammond instructed Weldon and Porter to take her bank cards to an automated bank teller machine and get money, using an access number given them by Love. Hammond remained at the school with his sawed-off shotgun and Julie Love. The other two returned later without money or the bank cards. The access number they had tried to use was incorrect

and the machines had kept the cards. Hammond, angry at this result, struck Love repeatedly with the shotgun. Porter then raped Julie Love.

Love, pleading not to be hurt, told Hammond she had more cards at home. They drove to Love's apartment complex but were deterred from entering by the presence of a security guard at the entrance to the complex.

At this point, Weldon demanded she be allowed to go home. She was dropped off at her apartment and the remaining three returned to the Grove Park school. Hammond got clothes hangers and a sheet from the trunk of the car. He tied Love's feet together, tied her hands behind her back and wrapped a sheet around her body. He then wrapped a coat hanger around her neck, and, telling Porter to pull one end while he pulled the other, tried to strangle Love. She struggled and broke free. Hammond got her under control and retied her hands. He told Porter to drive to Grove Park, where they stopped by the side of the road. Leaving Porter with the car, Hammond took Julie Love into the woods. Porter heard a gunshot. A few minutes later Hammond returned alone, his face flecked with blood.

Hammond returned home at 7:00 a.m. that morning. Weldon asked him what had happened to Julie Love. He did not want to talk about it then, but later told her that after Love "put her hands in front of her face," he "blew the side of her face off." He dumped her body in a trash pile and covered her up with a board.

The sawed-off shotgun was recovered from Michael Dominick, to whom Hammond had sold the gun not long after killing Julie Love with it. The victim's earrings were also recovered, after having been pawned for $140 by Janice Weldon.

After his arrest, Hammond gave Weldon's photograph and address to an inmate due to be released soon, and offered him $20,000 to kill her.

In addition to the foregoing, the state offered evidence establishing that on three previous occasions Emmanuel Hammond had kidnapped young women and robbed or attempted to rob them by obtaining their bank cards to use in automated teller machines. Moreover, he stabbed the third of these women numerous times and left her for dead on a trash pile in a wooded area.

The evidence, viewed in the light most favorable to the state, supports the jury's verdict at the guilt phase of the trial. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

1. After being questioned on voir dire, qualified prospective jurors were excused with instructions to return to court at 1:30 p.m. Friday. Fifty-six qualified prospective jurors were present in court at the appropriate time. Three were absent. One had called in to report that his father had suffered a stroke. This prospective juror was ex-

cused for medical reasons. (The defendant's attorney conceded at trial that he would have peremptorily struck this prospective juror if he had been present.) The court waited for over an hour for the other two. When they failed to show and could not be located, the court ruled that jury selection would proceed without them.

The defendant contends the venire was incomplete and the court erred by proceeding with the jury selection in these circumstances. However, there were more than enough qualified prospective jurors to allow the selection of a jury and three alternates. See cf. *Hall v. State*, 254 Ga. 272 (3) (328 SE2d 719) (1985). Moreover, the record shows the two absent jurors were located late Friday afternoon after the jury had been selected and were questioned by the court and the parties.[2] One had tried to call Thursday evening to leave a message; however, the county had turned off the court's answering machine and the juror could not leave a message. Questioning revealed that she had moved to Fayette County and therefore was not qualified to be a Fulton County juror. OCGA §§ 15-12-40 and 42. The other prospective juror had called the court at 12:30 that afternoon and left a message on the court's "voice message mailbox." She was having complications following foot surgery the previous Monday, was taking strong pain-killing medicine (Percocet), and was going to require follow-up medical treatment in the days and weeks ahead. The court ruled that because of her medical condition, this juror would have been excused for cause if the circumstances had been brought to the court's attention prior to jury selection.

While we do not find that the court erred by proceeding with the selection of the jury when it did, it is clear that if the court had delayed the process until the absent prospective jurors were located and questioned about their absence, they would have been excused for cause and the qualified jury venire would have been the same as the one the defendant complains about.

No error has been shown.

2. Janice Weldon telephoned Love's home before they went to Love's apartment complex, and listened to a recorded message saying, "Hi, this is Julie, and I can't come to the phone right now. . . ." The defendant did not object on hearsay grounds to the admission of the audiotape containing this message.[3] His hearsay objection to another tape containing incoming messages from friends and relatives was sustained, and, contrary to his assertion in his brief, this tape was not

---

[2] See transcript volume styled "Volume V (continued)," sealed by order of the trial court.

[3] He objected that the state had not laid a proper foundation for the admission of this tape. His objection initially was sustained, but the tape was admitted after the state laid further foundation for its admission.

played to the jury. No inadmissible hearsay was admitted over the defendant's objection, and this enumeration of error is without merit.

3. Janice Weldon testified the defendant had given her some earrings to pawn. These earrings had belonged to Julie Love. The state asked Weldon if the defendant had told her where the earrings had come from. Weldon answered, "I don't know if it's appropriate or not, but they used to go steal cars a lot, him and his cousin." The defendant moved for a mistrial on the ground that impermissible character evidence had been elicited. The court denied the motion for mistrial and gave curative instructions. There was no abuse of discretion. *Sabel v. State*, 250 Ga. 640 (5) (300 SE2d 663) (1983).

4. Weldon and Porter both testified that Hammond was armed with a 12-gauge shotgun at the time of the crime. Police were unable to locate the gun. However, during the trial, one Michael Dominick informed the prosecution that Hammond had sold him a sawed-off 12-gauge shotgun not long after Julie Love had disappeared. At the time he purchased the gun, Dominick did not know Hammond had anything to do with Julie Love's disappearance. The gun was seized by the police during a search of Dominick's residence in connection with criminal drug charges unrelated to this case. At the time of this trial, the gun had been in the police evidence room for many months. Neither the police nor the prosecution were aware that the gun had any connection to this case until Dominick, who was in jail, volunteered the information after the trial had begun. The state offered the gun and the testimony of Dominick as newly discovered evidence. The defendant objected and moved to exclude the testimony and the gun because Dominick's name was not on the list of witnesses furnished to him before trial, see OCGA § 17-7-110, and because, except for his testimony, there was nothing to tie the gun to the crime on trial. The court ruled: "[A]s the record now stands the Court grants the defense motion. . . ."

Later the defendant testified. On cross-examination, the state displayed the gun to the defendant and asked him if he had ever seen it. He admitted he had. He denied selling it to Dominick but admitted being present when, as he claimed, Janice Weldon sold the gun to Dominick. The state re-offered the gun in evidence. This time, the court admitted it. In addition, Dominick testified in rebuttal that Hammond had sold the gun to him.

The court initially granted the defendant's motion as the record stood *at that time*. The court did not preclude an attempt by the state to expand that record with subsequent testimony by the defendant. The trial court did not err by admitting the gun and testimony about its sale after the defendant identified it.

5. The defendant contends he was "denied a fair trial due to prosecutorial misconduct," claiming that, throughout the trial, the

prosecutor "expressed opinions, asked improper questions and introduced improper evidence."

The first instance of alleged misconduct concerns the testimony of Janice Weldon. Before she testified, the defendant moved to exclude her testimony because she had declined to speak to defense counsel before trial. Weldon, however, had the right to refuse to talk to the defendant's attorney. *Baxter v. State*, 254 Ga. 538, 541 (4) (331 SE2d 561) (1985). Absent evidence that the prosecutor did more than inform the witness of her right not to speak, there was no prosecutorial misconduct. Id. at 542.

The next two instances of alleged prosecutorial misconduct concern the testimony of the cellmate who testified the defendant tried to hire him to kill Janice Weldon. The prosecutor asked if the witness thought the defendant "would carry out his threats" against Weldon. The witness answered in the affirmative. The defendant objected on the ground the question "calls for a conclusion." The court sustained the objection and told the jury to disregard the answer. Later, the state asked the witness about a beating he had received after he had reported the defendant's attempt to kill Weldon. The defendant objected because the state failed to establish that the defendant was in any way responsible for the beating. The court sustained this objection also, and instructed the jury to disregard the testimony and not to draw any inference adverse to the accused from any testimony about an altercation the witness might have had with persons other than the defendant.

Assuming that an attempt to elicit arguably relevant testimony could in some instances amount to prosecutorial misconduct, we find that, especially in light of the court's curative instructions, there was no misconduct here that might have prejudiced the substantial rights of the defendant. *United States v. Odom*, 858 F2d 664 (11th Cir. 1988).

Any comments made by the prosecution during colloquy outside the presence of the jury could have had no effect on the jury. Hence, the defendant's fourth and fifth instances of alleged prosecutorial misconduct are immaterial. *Willis v. Kemp*, 838 F2d 1510 (III) (11th Cir. 1988).

The defendant's sixth instance of alleged prosecutorial misconduct occurred during the state's examination of Janice Weldon. She compared a shirt belonging to the defendant with one in a photograph not then admitted into evidence. The defendant objected because the photograph was not in evidence. This objection was sustained. Later, the photograph was admitted in evidence. We are unable to discern any prosecutorial misconduct here.

The defendant's seventh alleged instance of prosecutorial misconduct is dealt with in Division 4 of this opinion.

The final instance of alleged prosecutorial misconduct occurred when the prosecutor told the jury during its guilt-phase closing argument that the jury knew the defendant was guilty, and the reason the jury would know it "is to think how you would feel if you saw him on the streets knowing what you know about the defendant."

The defendant objected to this argument, and the parties discussed the objection at a bench conference outside the hearing of the jury. The defendant contended it was not proper for the prosecutor to ask the jurors to assume the position of the victim. The prosecutor responded that he was merely asking the jury to make a common-sense decision based on the evidence. The court, without expressly sustaining the defendant's objections, directed the prosecutor "go forward" with his argument without stating "directly or indirectly" that the jurors "should place themselves in the shoes of the victim."

The trial court did not commit reversible error by refusing to grant the defendant's motion for mistrial.

> [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting for lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo*, 416 U. S. 637, 647 (94 SC 1868, 40 LE2d 431) (1974). The prosecutor's argument was not an example of prejudicial misconduct that would entitle the defendant to a new trial. *Willis v. Kemp*, supra.

6. Contrary to the defendant's assertion, the trial court did conduct a hearing outside the presence of the jury to determine the admissibility of sentencing-phase testimony by a woman who was raped and whose home was burglarized by the defendant. See Unified Appeal Procedure § III (B) (1) (b). Georgia Court and Bar Rules at 9-11. The trial court correctly determined that the defendant was given sufficient notice of her testimony, see *Alderman v. State*, 254 Ga. 206 (8) (327 SE2d 168) (1985), and that the pre-trial dismissal of the prior case by means of a nolle prosequi (as part of a plea-bargained guilty plea by the defendant to other charges) did not preclude the state's use of the victim's testimony in aggravation in this case. *Potts v. State*, 259 Ga. 96 (14) (376 SE2d 851) (1989); *Moon v. State*, 258 Ga. 748, 758 (29) (375 SE2d 442) (1988). Anything to the contrary in Division VI of *Devier v. Zant*, Case No. 4:88-cv-74-RLV (N. District Ga., decided July 13, 1989) (unpublished opinion) (appeal pending), which the defendant cited at trial, is, in our view, inconsistent with Eleventh Circuit and U. S. Supreme Court precedent, and is not persuasive.[4]

---

[4] Our cases hold that prior crimes may be proven in aggravation even if the defendant

7. The defendant contends a juvenile adjudication for armed robbery should have been excluded from evidence at the sentencing phase because he was unrepresented by an attorney. The record, however, shows on its face that he was represented by an attorney. (We note that the commission of the crime was also established by the testimony of two witnesses. See *Potts v. State*, supra.) The trial court did not err by allowing the juvenile adjudication to be admitted in evidence during the sentencing phase of this trial. *Burrell v. State*, 258 Ga. 841 (7) (376 SE2d 184) (1989).

8. Our Code provides:

> (a) No attorney at law in a criminal case shall argue to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury because pardon, parole, or clemency of any nature may be granted by the Governor, the State Board of Pardons and Paroles, or other proper authority vested with the right to grant clemency.

> (b) If counsel for either side in a criminal case argues to or in the presence of the jury as provided in subsection (a) of this Code section, opposing counsel *shall have the right immediately to request the court to declare a mistrial, in which case it shall be mandatory upon the court to declare a mistrial.* Failure to declare a mistrial shall constitute reversible error.

(Emphasis supplied.) OCGA § 17-8-76.

During his closing argument to the jury at the sentencing phase of the trial, the prosecutor argued that Hammond should not be given a life sentence because:

> There is no life without parole in Georgia. So one day he will be a free man.

We agree with the defendant that this argument is one prohibited by OCGA § 17-8-76 (a) and is improper. However, the defendant

---

has not been convicted of the crime, so long as he has not been acquitted. *Jefferson v. State*, 256 Ga. 821, 827 (8 b) (353 SE2d 468) (1987). We note that in a recent case, the U. S. Supreme Court held that the Double Jeopardy Clause of the U. S. Constitution does not preclude the evidentiary use of a prior crime even when the defendant has been acquitted. *Dowling v. United States*, 493 U. S. ____ (110 SC ____, 107 LE2d 708) (1990). Since the entry of a nolle prosequi in the prior case at issue here did not amount to an acquittal or resolve any factual issue in the defendant's favor, see *Moon v. State*, supra, we need not decide in this case what effect *Dowling* will have on future Georgia cases (which are governed by our own Constitution and laws in addition to the Federal Constitution).

did not — as he could have under the terms of subsection (b) of the Code — move for a mistrial. Instead, he objected and asked the court to instruct the jury to disregard the argument. The court sustained the objection and gave curative instructions.

Our Code does not require that a mistrial be declared even without a request, and the trial court did not err by granting only the relief sought by the defendant at trial.

9. Finally, the defendant contends the court erred by failing to give the defendant's written requests to charge numbers 2 through 10. In request number 10, the defendant sought to advise the jury when he would be eligible for parole if given consecutive life sentences rather than a death penalty. It was not error to refuse to give this request to charge. *Quick v. State*, 256 Ga. 780 (9) (353 SE2d 497) (1987). The remaining requests to charge were either given verbatim or in substance. There was no error. *Pruitt v. State*, 258 Ga. 583 (13) (373 SE2d 192) (1988).

10. Our review in death penalty cases is guided by the Unified Appeal Procedure. See Ga. Court and Bar Rules, p. 9-1 et seq. The purposes of the UAP include "insuring that all legal issues which ought to be raised on behalf of the defendant . . . [are] asserted in a timely . . . manner" and that any error is corrected "as promptly as possible." UAP § I (A) (1) and (2), Ga. Court and Bar Rules at 9-3. In § IV (B) (1), the UAP provides:

> At any time after the case is docketed in the Supreme Court, the Superior Court may be directed by the Supreme Court to conduct further hearings, or to hold additional conferences for specified purposes, or to make additional findings of facts or conclusions of law in respect to issues raised by the parties on appeal *or perceived by the Supreme Court* although not asserted by the defendant or the state.

(Emphasis supplied.) Id. at 9-15.

We perceive a possible issue as to effectiveness of counsel in this case, and we therefore remand the case to the trial court to give the defendant an opportunity to litigate the issue of trial counsel's effectiveness.[5] The question of effectiveness involves an examination of not only trial counsel's performance but also prejudice. We agree with the dissent that if any deficiency in the representation by trial counsel did not materially affect the outcome of the proceeding, constitu-

---

[5] The proceedings on remand will be Hammond's opportunity to raise whatever he may wish on the issue of effectiveness of counsel. Of course, as we pointed out in *Gary v. State*, infra, a defendant cannot be forced to litigate an issue and may waive in whole or in part his right to challenge trial counsel's effectiveness. Ibid.

tional ineffectiveness would not exist. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984). However, we cannot agree that we can decide the question of effectiveness on the record before us. If it is necessary to appoint counsel to represent the defendant on remand, the court shall do so. After the conclusion of the proceedings on remand, the case shall be returned to this court for review of the proceedings on remand and for the statutory sentence review, unless the proceedings on remand obviate the need for further appellate review. See *Meders v. State*, 260 Ga. 49 (389 SE2d 320) (1990); *Gary v. State*, 260 Ga. 38 (2) (389 SE2d 218) (1990).

*Remanded for further proceedings. All the Justices concur, except Smith, P. J., who dissents as to Division 10 and the remand.*

SMITH, Presiding Justice, dissenting.

A remand in this case is a waste of time and judicial resources and is not warranted for the following reasons.

First, there has been no enumeration of error alleging ineffective assistance of counsel. While the Unified Appeal Procedure empowers this Court to review the possibility of error on its own initiative, we are constrained to the record developed at trial. That record either reflects ineffective assistance of counsel or it does not. If the record shows such an error, we should reverse the judgment and return it to the trial court for a new trial. Obviously, it does not. Since it does not, we should affirm the verdict. This Court is setting a terrible precedent by remanding this case. We are inventing a ground of appeal and creating delay by directing the trial judge to go on a witch hunt.

Counsel in this case was retained by appellant. He filed numerous and timely motions and interposed objections throughout the trial. Just because he did not handle the case the way we as individuals might have, does not establish that his actions were ineffective. He was on the scene and trying the case and was in a better position to understand the flow of the trial as it progressed. Circumstances dictate trial strategy and I do not believe that the record shows that the appellant's trial strategy constituted error.

Additionally, even if counsel was deficient, it is not established that his deficiency rose to the level of justifying a remand. To establish a valid claim of ineffective assistance of counsel, a party must show that counsel was deficient, and, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). For the following reasons, I believe that even if any deficiency of counsel was brought to light, the result would have been the same.

First, let us look at appellant Hammond's resume of criminal acts and violent behavior.

1. While still a juvenile, Hammond and another robbed a woman

at gunpoint. She was kidnapped, driven in her car to an automated bank teller machine and raped twice.

2. On another occasion, while still a juvenile, Hammond and another robbed a man at gunpoint, kidnapped him and drove the victim around in his own car.

3. Later, Hammond robbed another woman at knifepoint, kidnapped her, raped and sodomized her, slit her throat, stabbed her five times in the chest and left her for dead in a pile of trash.

4. He accosted still another woman at knifepoint, took her car and drove her around, threatening to rape and kill her. She managed to escape before he could carry out his threats.

5. He broke into another woman's home while she was in bed, asleep, woke her up and sexually fondled her. Before he left, he stole cash and a tape recorder.

6. In the present case, he was arrested after he tried to kill his girl friend, Janice Weldon, and while in jail he offered to pay another inmate $20,000 to kill her.

In light of all this, was Hammond's attorney supposed to present voluminous good character evidence in a case where Hammond murdered his *sixth* woman victim in cold blood?

Second, there is the grisly story of the night of the murder of Julie Love. This story is one of a strong, able-bodied man, armed with a sawed-off shotgun, riding the streets looking for his sixth woman victim. The evidence presents a brutal picture in live action as follows:

1. Hammond, Porter and Weldon (Hammond's girl friend, whom he later tried to hire someone to kill) were driving around in Hammond's car.

2. Hammond spotted Julie Love walking by the side of the road.

3. Hammond ordered Porter to stop the car.

4. Hammond asked Ms. Love if she wanted a ride. She declined and they drove on.

5. Hammond watched and saw Ms. Love returning to the road from the driveway of the house she had claimed was her home.

6. Hammond ordered Porter to turn around and drive past Ms. Love again, with the car lights on bright.

7. Hammond exclaimed as they drove past Ms. Love and saw a car stopped by the side of the road: "I knew it! I knew it!"

8. Hammond told Porter he drove too slowly and ordered Weldon to drive. They returned to where Julie Love was walking.

9. Hammond jumped out of the car, armed with a sawed-off shotgun, grabbed Ms. Love, and threw her into the back of the car.

10. Hammond ordered Weldon to drive to Grove Park Elementary School which he had attended.

11. Hammond ordered Weldon to search Julie Love's purse. He

then ordered Weldon and Porter to take Ms. Love's bank cards to an automated bank teller and get money using an access number provided by her.

12. Hammond remained at the school with Julie Love. Neither Porter nor Weldon could testify what happened at the school while they were gone. But while awaiting trial, Hammond bragged about raping Ms. Love. According to the testimony of a jailer, Hammond pulled his pants down to his knees and, holding his sex organ in his hands, told the jailer "that's what [he] had gave [sic] to Julie Love."

13. Hammond beat Ms. Love with his shotgun when Porter and Weldon returned without money.

14. Hammond stood by while Porter raped Julie Love.

15. Hammond, after Ms. Love pleaded with him not to hurt her anymore, directed the driver to proceed to her apartment complex to get more credit cards, but they did not enter because of the presence of a security guard.

16. Hammond and Porter, at Weldon's request, dropped Weldon at her apartment, then took Julie Love back to the school.

17. Hammond got clothes hangers and a sheet from the trunk of the car.

18. Hammond bound Julie Love's feet together, bound her hands behind her back, and wrapped a sheet around her body.

19. Hammond wound a coat hanger around Julie Love's neck.

20. Hammond, telling Porter to hold one end, tried to strangle Julie Love with a coat hanger.

21. Hammond, after Ms. Love struggled free, got her under control and retied her hands.

22. Hammond ordered Porter to drive to nearby Grove Park.

23. Hammond told Porter to stay in the car and took Julie Love into the woods.

24. Hammond shot Julie Love in the head with his sawed-off shotgun, blowing "the side of her face off."

25. Hammond hid her body in a trash pile by placing a board over it. This was the second woman he had left in a trash pile.

26. Hammond returned to the car, his face flecked with blood.

27. Hammond sold the shotgun after he killed Julie Love.

28. Hammond gave Ms. Love's earrings to Weldon and told her to pawn them.

Consider this synopsis of Hammond's life.

a. Hammond orchestrated, directed, or committed 27 of these 28 acts and stood by with his sawed-off shotgun, while Porter raped Julie Love in the 28th one.

b. Hammond, since a juvenile, has led a life of crime and violence.

c. Hammond has never respected the law or the rights of others.

d. Hammond has failed to exhibit one iota of simple human decency.

e. Hammond has committed one or more of the following crimes to six different women.

Here's the roll call:

A. Terrorized — six women, including *Julie Love.*

B. Kidnapped — four, including *Julie Love.*

C. Raped — three, including *Julie Love.*

D. Threatened to rape — one.

E. Sodomized — one.

F. Assaulted either physically or by using knife or gun — five, including *Julie Love.*

G. Cut — one.

H. Stabbed — one.

I. Slit the throat — one.

J. Robbed — four, including *Julie Love.*

K. Threatened or tried to kill — three.

L. Attempted automatic bank teller and credit card theft — two, including *Julie Love.*

M. Falsely imprisoned in an automobile — four, including *Julie Love.*

N. Left in trash pile, either dead or thought to be dead — two, including *Julie Love.*

O. Sexually assaulted (fondled a woman after breaking into her house) — one.

P. Solicited murder — one.

Q. Murdered — one, *Julie Love.*

Out of the above 17 criminal acts, Julie Love was forced to suffer through nine.

Hammond's criminal record includes an attack on one man, but his modus operandi was the same. He and another felon kidnapped and drove the victim around in the victim's car and robbed him at gunpoint.

In light of the above, it is clear that a remand of this case to the trial court to look into possible ineffective assistance of counsel is a travesty of justice, a waste of judicial resources, and an insult to the victims that he has raped, robbed, assaulted, terrorized, and murdered, as well as to their families.

In *Ford v. State*, 257 Ga. 461, 463 (360 SE2d 258) (1987), this Court held, "[t]he factors normally considered in sentencing are (1) the character of the defendant, including his previous criminal activity, if any, and (2) the circumstances of the crime on trial." See also *Clemons v. Mississippi*, ___ U. S. ___ (110 SC 1441, ___ LE2d ___) (1990).

Matching the appellant to these two criteria, what do you find?

As to *character*, the record shows Hammond to be without a shred of human decency, and totally lacking a single, socially redeeming trait of character. This has been true since he was a juvenile.

His criminal activity has been limitless and legion as may be seen elsewhere in this dissent.

As to the circumstances of this crime, there are no words that can fully describe the 28 acts or actions the appellant was involved in up to and including blowing "the side of her [Julie Love's] face off."

The two acts that appellant pulled off in jail awaiting trial speak eloquently about his character and how he feels about the murder of Julie Love. Those acts demonstrated a complete absence of any remorse and an utter disdain for the victim, society and the law.

They were: 1) his attempt to hire an inmate to kill his girl friend, Janice Weldon, to prevent her from testifying against him, and 2) the act of showing his private parts to an officer and stating what he did to Julie Love.

All of these crimes follow a pattern which shows that they were premeditated, planned with a purpose, and evidence of a callous and indifferent view toward the life, rights and well being of his fellowman.

I do not think the appellant's attorney was ineffective at either the guilt-innocence phase or the sentencing phase of the trial. Ineffective assistance of counsel can only be established by showing deficient attorney performance *and* actual prejudice. *Strickland v. Washington*, 466 U. S., supra at 687. It was Hammond's burden to show that mitigating evidence existed which reasonably could have led the jury to spare his life.

The appellant's attorney attempted in good faith to do so. He cannot be faulted for failing to present that which did not exist. I think one example is enough to show this. The appellant's grandfather testified for him. His testimony in mitigation covered approximately one page. If his grandfather could tell all the good he knew about him in one page, it is clear that the appellant could not find anyone else that could supply greater mitigating evidence.

Appellant could not even help himself by going on the stand. What explanation could he give for his criminal behavior? The appellant's counsel knew this. He was in a catch 22. He was damned if he did and damned if he didn't.

Harm as well as error must be shown to warrant a retrial, even in a death penalty case. *Clemons*, supra at 1450-52.

Furthermore, as the United States Supreme Court stated in *Boyde v. California*, ____ U. S. ____ (____ SC ____, ____ LE2d ____) (1990):

There is, of course, a strong policy in favor of accurate deter-

mination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials . . . where the claimed error amounts to no more than speculation.

I stress again, there is no claimed error in this case, and the remand is based on mere speculation.

Assuming, for the sake of argument, that counsel was deficient, the deficiency was harmless. If there is enough evidence to envision a possible issue of ineffectiveness, there is enough evidence for this Court to determine if it was harmless. The holding in *Clemons*, supra, supports the proposition that a State Supreme Court can make a determination that the deficiency of counsel does not rise to the level of constitutionally harmful error. We should do likewise, and not set a new precedent of remanding to the trial court because we perceive the *mere remote* possibility of a trial court finding ineffective assistance of counsel.

It is difficult to understand how any defect in representation could have deprived this appellant of mitigating circumstances. The evidence of aggravation in this case is so strong, this appellant is so dangerous, his criminal history is so lengthy, his crime is so monstrous, and his own grandfather's testimony only covered one page.

Those responsible for rendering an opinion as to the legality of the trial in February 1586 of Mary Queen of Scots made the following statement:

"For this trial, let this proposition be delivered in known terms, and say thus, every man that breaks any law is to be punished because he was willing to bear the penalty of his offense."

I would affirm the conviction and the death sentence of Emmanuel Fitzgerald Hammond.

DECIDED NOVEMBER 8, 1990 —
RECONSIDERATION DENIED DECEMBER 4, 1990.

*William A. Wehunt,* for appellant.
*Lewis R. Slaton, District Attorney, Richard E. Hicks, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,* for appellee.