## S91P0845. TODD v. THE STATE.
(410 SE2d 725)

HUNT, Justice.

William Lamar Todd was convicted by a jury in Harris County of murder and armed robbery. He was sentenced to death for the murder.[1]

1. After the victim failed to appear for work on July 12, 1988, the police were called to his home. The victim lay on the kitchen floor. He

---

[1] The defendant was arrested on July 27, 1988, in Galveston, Texas. The trial began on May 1, 1989, and concluded on May 6, 1989. A motion for new trial was filed and denied after hearing on February 20, 1991. The case was docketed in this court March 25, 1991, and the case was argued orally on June 5, 1991.

had been bludgeoned to death. A blood-soaked towel and bedspread found near the body indicated someone had attempted, unsuccessfully, to clean the blood from all over the kitchen. The victim's car and many items from his home were missing.

Two weeks later, Todd and his female companion, still in possession of the victim's car, were arrested in Texas. Todd gave several statements to the police. Todd at first denied knowing the victim. Then he admitted knowing him, but denied killing him. In a third statement, Todd admitted killing the victim after a struggle. After it was pointed out to him that there were no signs of a struggle, Todd gave a fourth statement. He told police that he and his female companion intended to wait until the victim (with whom Todd was living) was asleep, tie him up and take his car. Todd's companion however, was tired of waiting in her hiding place (an old bus) and told Todd to hurry or she would leave. Todd got a hammer, entered the victim's kitchen and hit him in the head until he "laid down," and Todd "seen all that stuff coming out of his head." (The autopsist testified that the victim had been hit in the head at least 12 times.)

Todd and his companion then took various of the victim's possessions from his house, took his car and drove off.

After selling some of the stolen items in Georgia, the two drove to Birmingham, Alabama. They sold more of the victim's possessions there, and discussed trading the victim's car for cocaine. Todd got into an argument with one of the men with whom they were staying, hit him on the head with a hammer, shot him, and took his wallet. Todd and his companion drove to Galveston, sold some more of the victim's possessions, got into more arguments, and finally were arrested.

The evidence supports the conviction for murder and armed robbery. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first two enumerations of error, Todd complains of the prosecutor's closing arguments at the guilt and sentencing phases of the trial.

(a) At trial, Todd objected to only one of the three portions of the prosecutor's guilt-phase closing argument about which he now complains. The time to object to improper closing argument is when the impropriety occurs at trial, when the trial judge may take remedial action to cure any possible error. See, e.g., UAP § (A) (2) (d). When no timely objection is interposed, the test for reversible error is not simply whether or not the argument is objectionable, or even if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed the result of the trial. *Ford v. State,* 255 Ga. 81, 90 (335 SE2d 567) (1985). As to the two portions of the state's guilt-phase argument not objected to at

trial, we find no harm sufficient to overcome the defendant's procedural default, even assuming that the two arguments were, as the defendant contends, objectionable.

In the third instance, in response to the defendant's closing argument about the criminal backgrounds of many of the state's witnesses, the prosecutor pointed out that the state had to take its witnesses as it found them and that this was a "dope-related homicide." The defendant objected that the prosecutor misstated the evidence. A prosecutor, however, has the right to argue reasonable inferences from the evidence, and the characterization of this homicide as being "dope-related" was eminently reasonable. See *Conner v. State*, 251 Ga. 113 (6) (303 SE2d 266) (1983). The denial of Todd's motion for mistrial was not error.

(b) Todd objected to only one of the three portions of the prosecutor's sentencing-phase arguments about which he now complains. As to the portions of the sentencing-phase argument not objected to, pretermitting any question of their propriety we do not find sufficient prejudice to overcome the procedural default.[2]

The defendant did object when the prosecutor analogized the defendant's testimony about his refusal to shoot the man who may have killed the defendant's sister to a scene in a well-known movie in which a murder suspect refused to kill a fly that had landed on his face so that his accusers might think he was "so harmless he wouldn't even hurt a fly." We do not agree with the defendant that this argument impermissibly introduced "facts" not in evidence. See *Conner v. State*, supra at 123. Parables of the kind at issue here generally are permissible, and the mere reference to a movie title added nothing of any great significance to the point of the prosecutor's argument. The trial court did not err by denying the defendant's motion for mistrial.

3. Todd contends in his 3rd, 5th, and 17th enumerations of error that the trial court erred by denying three motions for mistrial during the state's cross-examination of him at the sentencing phase of the trial.

The first motion was made when the victim's mother left the courtroom sobbing after Todd graphically described hitting the victim

---

[2] We observe, however, that while it would be improper to urge the imposition of a death sentence on the basis of a defendant's religious beliefs, when the defendant offers mitigation evidence of his post-arrest church attendance and activities, the prosecutor is entitled to raise questions in his argument about the genuineness of the defendant's "jail-house" religious conversion. Such an argument addresses itself to the sincerity of the defendant's rehabilitation, which is a legitimate consideration on the issue of sentence.

In addition, we point out that, contrary to Justice Benham's dissent, the prosecutor's argument that "We know he's been examined by a psychologist" was factually supported by the defendant's own testimony, and was neither a misstatement of the evidence nor a statement of facts not in evidence.

in the head and watching the blood "squirt[ ] out." Todd contends that her reaction was the result of improper cross-examination by the district attorney. We do not agree that the state's cross-examination was improper; in view of the defendant's conflicting statements and trial testimony about the facts of the crime, and his denial even at the sentencing phase that he was guilty of murder, the state was entitled to examine the defendant about just what the defendant contended was the truth about the victim's death.

The victim's mother immediately left the courtroom, and the trial court instructed the jury to disregard the incident. The court did not abuse its discretion by denying the motion for mistrial. *Messer v. State*, 247 Ga. 316 (6) (276 SE2d 15) (1981).

The second motion for mistrial followed this portion of the state's cross-examination:

A. . . . I realize this is your first capital case as a D.A.; but I am not a murder[er] and I don't just go around hitting and killing people.

Q. Are you keeping score of my capital cases?

A. I remember when you were elected. I think I was still in . . . jail here when you took the position as D.A. . . .

Q. I believe I've been around and have been here with a lot more folks like you —

A. As D.A.? Like me? Like me?

Q. No, I'll withdraw that. I've not run across one like you.

The defense objected "to the comparisons" and moved for a mistrial. The court did not explicitly rule on either the objection or the motion, directing instead that the parties simply "get on with it."

The prosecutor should not have compared the defendant to others in his experience. Nevertheless, the subject of the prosecutor's expertise was brought up by the defendant. We do not think the jury was impressed either way by this colloquy, and find any error harmless. The implicit denial of a mistrial was not an abuse of discretion. *Sabel v. State*, 250 Ga. 640 (5) (300 SE2d 663) (1983).

The third motion for mistrial came after a brief redirect examination in which the defendant claimed never to have been convicted of anything other than a traffic violation before being convicted of murder and armed robbery in this case. Asked on re-cross about a narcotics charge in Florida, the defendant admitted having been arrested for possession of marijuana and paying a "misdemeanor fine."

The marijuana charge was a proper subject of rebuttal. *Wade v. State*, 258 Ga. 324, 329 (10) (368 SE2d 482) (1988). Moreover, at the sentencing phase of a death penalty trial, a prior crime may be proven by means other than a certified copy of a conviction. *Hammond v.*

*State,* 260 Ga. 591 (6) (398 SE2d 168) (1990). It follows that when a defendant contradicts his own testimony on re-direct by his admission on re-cross that he has a prior drug conviction, his testimony is not excludable merely because the state does not choose to bolster its impeachment with a certified copy of that conviction.

The state did not prove merely that the defendant had been charged with a crime. See *Jefferson v. State,* 256 Ga. 821, 827 (8 b) (353 SE2d 468) (1987). The trial court did not err by overruling the objection and denying Todd's motion for mistrial.

4. Relying on *Booth v. Maryland,* 482 U. S. 496 (107 SC 2529, 96 LE2d 440) (1987), the defendant contends that improper "victim-impact" evidence and argument were presented to the jury. *Booth v. Maryland,* however, has been overruled. *Payne v. Tennessee,* 501 U. S. ____ (111 SC 2597, 115 LE2d 720) (1991). Under *Payne,* just as the defendant may introduce evidence about his individual personality and argue that evidence to the jury, so may a prosecutor similarly address the "human cost of the crime of which the defendant stands convicted." Id. 111 SC at 2609. There is no merit to this enumeration of error.

5. There was no improper curtailment of the death-qualification voir dire. *Cargill v. State,* 255 Ga. 616 (4) (340 SE2d 891) (1986). The trial court's rulings on the death-qualifications of the prospective jurors were "within the deference due the trial judge's determination." *Jefferson v. State,* 256 Ga. 821, 824 (2) (353 SE2d 468) (1987).

The defendant contends that prospective jurors Duck and Feronne should have been excused because they had discussed the case and because Duck did not answer truthfully questions about her discussion of the case. The defendant did not challenge Feronne, and the trial court did not err by failing to excuse this juror sua sponte. *Spencer v. State,* 260 Ga. 640 (1) (398 SE2d 179) (1990). Duck was challenged based on the alleged inconsistency of her answers with Feronne's. Duck testified that two weeks earlier,

> probably one day at lunch . . . when I first got my summons that I was on the jury . . . [I said] it was going to conflict with something we had at work and he heard me say it and he said, "Oh, I'm on that one too," and that was it. . . . I don't remember anything else.

Feronne testified:

> I knew I had jury duty but I thought it was for local criminal cases or whatever and a conversation came up that it had to do with a murder case . . . that took place last year and the person fled and they apprehended the suspect in Texas, I be-

lieve, something like that, and that's about all, really. Nothing about who did what or which, you know.

Although the testimony of the two prospective jurors is somewhat inconsistent, under either version, the discussion of the case was minimal. The testimony does not support the defendant's contention that Duck perjured herself or that she should have been excused for cause.

The defendant contends that prospective juror Duncan should have been excused for cause because she read the paper after having been instructed not to. She testified that she saw the headline and that it was "hard not to glance at it," and that although she did not read the article "because we're not supposed to go into all that, but I guess I'm human, I just skimmed it." She also testified, "I don't think you can believe what you read in the newspaper." The trial court did not err by denying the defendant's motion to excuse this juror for cause.

Nor did the court err by denying the defendant's motion to excuse for cause a driver's license examiner employed by the Department of Public Safety. This juror was not a full-time police officer that, under *Hutcheson v. State*, 246 Ga. 13 (268 SE2d 643) (1980), must be excused for cause automatically upon request, no matter what the officer's voir dire answers show. The automatic excusal rule not applying to this prospective juror, the trial court did not err by concluding from his answers that he could be a fair and impartial juror.

6. Although the 24-page transcript of the defendant's pretrial statement originally furnished the defendant contained some inaccuracies (which were corrected in a supplemental transcript furnished the defendant during the trial) it was sufficiently complete to satisfy the requirements of OCGA § 17-7-210. *Myers v. State*, 196 Ga. App. 104 (2) (395 SE2d 372) (1990).

7. The defendant moved to exclude evidence of "similar crimes" committed by the defendant in Birmingham. The state responded that the events in Birmingham were part of a continuous criminal enterprise beginning before the victim's death when the defendant went to Birmingham to negotiate a drug deal that involved trading an automobile for cocaine, continued when the defendant returned to Georgia, killed the victim and with his companion stole the victim's car and other possessions, further continued back to Birmingham where they attempted drug deals that did not go through and then, out of money, committed another robbery by use of the same weapon (a hammer) used in Harris County, Georgia, and fled to Texas using the Birmingham victim's money and the Harris County victim's car.

We agree with the state that the crimes complained of here were not independent crimes. *Davis v. State*, 255 Ga. 598, 606 (340 SE2d

869) (1986). See also *Ingram v. State*, 253 Ga. 622 (6) (323 SE2d 801) (1984); *Putman v. State*, 251 Ga. 605 (2) (308 SE2d 145) (1983).

8. There was no error in the admission of allegedly gruesome photographs, or in the admission of the hammer the defendant used in the Birmingham assault. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987).

9. The court did not err by allowing the state to offer in evidence a piece of the victim's skull which the state contended was relevant to prove "the size and character of the weapon used," where the murder weapon was not recovered. *Hicks v. State*, supra; *Green v. State*, 242 Ga. 261 (8 b) (249 SE2d 1) (1978). See also *Hance v. State*, 254 Ga. 575 (4) (332 SE2d 287) (1985).

10. The defendant was not, as he contends, entitled to jury instructions on the lesser offenses of voluntary manslaughter and theft by taking. *Hopper v. Evans*, 456 U. S. 605 (102 SC 2049, 72 LE2d 367) (1982); *Keeble v. United States*, 412 U. S. 205 (93 SC 1993, 36 LE2d 844) (1973).

11. Because the defendant failed to make a preliminary showing that his mental condition would be a significant factor at trial, the trial court did not err by failing to provide independent psychiatric assistance to the defendant. *Childs v. State*, 257 Ga. 243 (5) (357 SE2d 48) (1987).

12. There was no error in the court's instructions concerning the § b (2) statutory aggravating circumstance. OCGA § 17-10-30 (b) (2). For purposes of this statutory circumstance, armed robbery is a capital felony. *Peek v. State*, 239 Ga. 422, 432 (III) (238 SE2d 12) (1977).

13. In his final enumeration of error, the defendant contends he was denied effective assistance of counsel at trial. The two attorneys who represented the defendant at trial were relieved of their appointments after trial, and a new attorney was appointed to represent the defendant on his motion for new trial and on appeal. The issue of trial counsel's effectiveness was raised at the hearing on the motion for new trial and, after hearing evidence, the trial court found against the defendant's claim of ineffectiveness. The record supports the trial court's conclusion that the defendant failed to overcome the "strong presumption" that trial counsel performed effectively. *Ferrell v. State*, 261 Ga. 115 (3) (401 SE2d 741) (1991).

An issue of post-conviction counsel's effectiveness has been raised by way of an amicus curiae brief. In this brief, it is urged that post-conviction counsel failed effectively to present an issue of trial counsel's effectiveness. Moreover, it is contended that when the defendant questioned the performance of his post-conviction counsel, another attorney should have been appointed to present this "ineffectiveness" claim.

Pretermitting any issue of the proper scope of an amicus brief,

see *Fulton County v. Bartenfeld*, 257 Ga. 766, 771 (5) (363 SE2d 555) (1988), we decline the invitation to remand this case to the trial court for further hearing on the issue of the effectiveness of post-conviction counsel. The trial court gave the defendant an opportunity to voice his complaints about his post-conviction counsel and the trial court, after hearing from the defendant and hearing from his counsel about the latter's qualifications, experience, and preparation in this case, found that counsel was competent and was representing the defendant well. Compare *Davis v. State*, 255 Ga. 598 (14) (340 SE2d 869) (1986). The trial court's investigation was sufficient. A criminal defendant is not entitled to the appointment of another attorney as a matter of right whenever he expresses his dissatisfaction with his present attorney. *Blankenship v. State*, 258 Ga. 43 (10) (365 SE2d 265) (1988).

14. By way of a supplemental brief, the defendant contends the trial judge should have recused herself from the hearing on the motion for new trial. He contends that an assistant district attorney during the defendant's trial was employed as a judicial law clerk during the pendency of his motion for new trial. Relying on *Pope v. State*, 256 Ga. 195 (26) (345 SE2d 831) (1986), the defendant contends the circumstances gave rise to an appearance of partiality sufficient to warrant the recusal of the trial judge, and moves for a remand and a hearing on this issue.

However, the defendant does not contend that the law clerk was involved with his case while she was an assistant district attorney, or that she worked on this case as a judicial law clerk (she was law clerk to all the judges in the circuit, not just to the trial judge in this case). Hence, the defendant's motion provides no grounds for recusing the trial judge and no basis for a remand. *Pope v. State*, supra at 214. Cf. *Potts v. State*, 259 Ga. 96 (27) (376 SE2d 851) (1989).

15. The jury found that the offense of murder was outrageously or wantonly vile, horrible and inhuman in that it involved depravity of mind and aggravated battery. OCGA § 17-10-30 (b) (7). The evidence supports this finding. OCGA § 17-10-35 (c) (2). Compare *Taylor v. State*, 261 Ga. 287 (13) (404 SE2d 255) (1991). We do not find that the death sentence was imposed as the result of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1). The sentence of death is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. All the Justices concur, except Benham, J., who dissents.*

APPENDIX.

*Taylor v. State*, 261 Ga. 287 (404 SE2d 255) (1991); *Hall v. State*, 259 Ga. 412 (383 SE2d 128) (1989); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Davis v. State*, 255 Ga. 598 (340 SE2d 869) (1986); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Bowden v. State*, 239 Ga. 821 (238 SE2d 905) (1977); *Young v. State*, 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975).

BENHAM, Justice, dissenting.

Because I am convinced that the argument of the prosecuting attorney was so flagrantly improper as to demand a new trial for appellant, I must dissent.

1. During the sentencing phase argument, in an apparent effort to extinguish any doubts the jury might have about appellant's mental capacity, the district attorney told the jury that

> we know he's been examined by a psychologist [and that] [w]e have no evidence of that [mental instability]. So you would have to assume that there is no mental pathology that led to this . . . attack.

Even though he knew that appellant had not been psychologically examined, the prosecuting attorney, through this argument, deliberately misled the jury into believing that such an examination had taken place and had resulted in a conclusion that appellant was mentally stable. The remark was impermissible not only because it stated facts not in evidence, but because it was a deliberate misstatement of fact. Considering the magnitude of the consequences, it is more important in the sentencing phase of a death penalty case than in any other criminal proceeding that prosecuting attorneys be held to their duty to seek justice, to temper their advocacy on behalf of the State with a determination that the truth be served. Misstating the facts and misleading the jury is a violation of that duty and must not be condoned.

2. In the course of his argument in support of the death penalty, the prosecuting attorney made several references to religion, Christianity, and the teachings of the Christian Bible. Permitting those arguments amounted to constitutional error.

On the way to reaching the conclusion that it was constitutional error to permit the jury to take a Christian Bible with it into the jury room, the U. S. District Court for the Northern District of Georgia

made the following observations:

> It is well settled that religion may not play a role in the sentencing process. [Cits.] . . . The jury which sentenced [appellant] had a duty to apply the law of the State of Georgia as given by the trial judge, not its own interpretation of the law or its own interpretation of precepts of the Bible, in determining whether [appellant] should live or die. . . . To the average juror, Webster's Dictionary may be no more than a reference book, . . . but the Bible is an authoritative religious document and is different not just in degree, although this difference is pronounced, but in kind. . . . As the United States Supreme Court stated in *Godfrey v. Georgia*, 446 U. S. 420, 428, [(100 SC 1759, 64 LE2d 398) (1980)]: "If a State wishes to authorize capital punishment, it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed' guidance, 'and that make rationally reviewable the process for imposing a sentence of death.' " As the Supreme Court further stated: "A capital sentencing scheme must, in short, provide a 'meaningful basis for distinguishing the few cases in which the penalty is imposed from the many in which it is not.' " [Cit.] Georgia's death penalty statute lays out specific guidelines for separating "the many" from "the few." [Cit.] The Bible, however, in some places explicitly rejects the drawing of distinctions in murder cases: "Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." [Cits.] Whereas the Bible commands that "thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot," [cit.] it is the law in this Circuit that arguments which disparage mercy as a valid sentencing consideration "strike at the most important component of a capital jury's discretion favoring capital defendants." [Cits.] Especially where, as here, such arguments come from a source which "would likely carry weight with laymen and influence their decision," [cit.] the effect may be highly prejudicial to the defendant, and the confidence in the reliability of the jury's decision which must guide imposition of the death penalty may be undermined. [*Jones v. Kemp*, 706 FSupp. 1534, 1559 (N.D. Ga. 1989).]

A review of the prosecuting attorney's argument, in light of the

preceding principles, reveals several instances of prejudicially improper argument. The prosecutor urged that the State is entitled to "Old Testament Retribution." Quoting from the New Testament, "Blessed are the merciful for they shall obtain mercy," the prosecutor disparaged mercy as a sentencing consideration in this case. One of the Biblical passages about which the court in *Jones v. Kemp*, supra, expressed concern was used here in just the manner that court feared it would be: the prosecuting attorney quoted the Bible as saying, "He who sheddeth the blood of man, by man shall his blood be shed," in support of the death penalty. In a blatant attempt to appeal to Christian sensibilities, the prosecutor told the jury that he had heard many arguments to the effect that "Christians are a bunch of wimps that will not enforce the laws of the Bible because Jesus came to forgive us of our sins." That one argument not only appealed to religious affiliations which have no proper place in jury deliberations, but also urged the jury to apply a law other than that of Georgia as given to the jury by the trial court. Early in the argument, the prosecuting attorney even sought to drive a wedge of religion between appellant and his counsel, identifying first himself and then one of the defense attorneys as a Baptist, thereby aligning that member of the defense team with the prosecution.

The State's injection of religion into the considerations for the jury in determining sentence was wholly improper and amounts to seeking to have the death penalty imposed not in accordance with the guidelines established by statute, but with passion and prejudice. The appeal to religious principles is directly opposed to the requirement the United States Supreme Court articulated in *Godfrey*, supra, and violates the "constitutional responsibility to . . . apply [the] law in a manner that avoids the arbitrary and capricious infliction of the death penalty." Id. In vacating the sentence of a televangelist convicted of fraud offenses, the Fourth Circuit Court of Appeals held that it is a deprivation of due process for the trial judge impermissibly to take his own religious characteristics into account in sentencing. *United States v. Bakker*, 925 F2d 728 (4th Cir. 1991). In the same way, it was a denial of appellant's right to due process for the jury deciding whether he should be executed to be told to make that decision on the basis of religious, not legal, principles.

3. In *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985), the United States Supreme Court held that a prosecutor's argument that the jury should not view itself as deciding whether the defendant would die, since there was automatic review by the State Supreme Court,

> rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened "need for reliability in

the determination that death is the appropriate punishment in a specific case." [Cit.] Id. at 323.

In the present case, the prosecuting attorney, in the process of telling the jury that it was "free to do under the law, and even outside the law in some instances, whatever it want[ed] to," made a reference to the possibility of a future pardon for appellant. Although the argument here was not the direct argument made in *Caldwell* that the jury was not the last word on the subject of the death penalty, it was nonetheless a reference to the fact that appellant would have an opportunity to seek clemency from others, notwithstanding this jury's decision that he should die. The prosecutor here attempted to do indirectly what this court declared in *Fleming v. State*, 240 Ga. 142 (240 SE2d 37) (1977), could not be done directly. Noting that "this type of remark has an unusual potential for corrupting the death sentencing process," this court held

> that it was reversible error for the prosecutor to mention to the jury in his arguments during the death penalty phase, that any sentence of death would be reviewed. . . . The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence by making predictions of the consequences of the jury's verdict. . . . The jury is given the heavy burden of making the decision of whether the defendant will live or die. Comments about appellate safeguards on the death penalty suggest to the jury that they can pass the responsibility for the death sentence on to this court. [Id. at 146.]

In a proceeding as weighty as a death penalty sentencing hearing, we must be alert to prevent subversion of the clear guidelines by indirect tactics. The prosecuting attorney's remarks introduced to the jury's consciousness the notion that they could sentence him to death without being personally responsible — someone else would look at the sentence and consider whether appellant should die for his crime. That responsibility, heavy as it is, must remain where the law has placed it, on the shoulders and consciences of the jurors.

4. During argument to the jury, defense counsel did not object to the three instances of improper argument I have discussed above. In Division 2 of the majority opinion, the majority finds no harm sufficient to overcome the defendant's procedural default. I cannot agree. As noted above, the jury in this case was subjected to emotional, religiously-charged arguments and was urged to return a death sentence on the basis of misstatements of fact. Given the magnitude of those improprieties, I am convinced that there exists a reasonable

probability that the result in the sentencing phase may well have been different.[3] See *Ford v. State*, 255 Ga. 81 (335 SE2d 567) (1985).

Consequently, I would consider the argument, find the allowance of the argument to be constitutional error, and vacate the death sentence and remand with direction to conduct a new sentencing hearing. Given those considerations, I must respectfully dissent from the majority's affirmance of the sentence in this case.

DECIDED NOVEMBER 27, 1991 —
RECONSIDERATION DENIED DECEMBER 18, 1991.

*David L. Roberts,* for appellant.
*Douglas C. Pullen, District Attorney, Edward F. Berry, Peter B. Hoffman, Assistant District Attorneys, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Robert D. McCullers, Staff Attorney,* for appellee.

---

[3] In addition, I am struck by the powerful irony that would be inherent in holding in this case that trial counsel was not ineffective, but that trial counsel's failure to object to improper argument makes appellate review of that argument unnecessary.