## 45060. WADE v. THE STATE.
(368 SE2d 482)

CLARKE, Presiding Justice. ,

Johnny Lamar Wade was convicted of murder and sentenced to death by a Newton County jury. This is his appeal.[1]

1. On the morning of August 8, 1986, the victim, 13-year-old Lance Barnes, left his brother's house, where he had spent the night, and rode his bicycle to nearby Kittle's store.

The defendant stopped by Kittle's store at 11:30 that morning. He bought a sandwich and, while it was heating, told the owner that he was not going to pay further child support, and threatened to kill his ex-wife and her male companion if he saw either of them. Then the defendant played some video games, with the victim and another teenager.

The defendant left at 1:00 p.m. The victim put his bicycle in the back of the defendant's blue Ford pickup truck, and left with him.

Shortly thereafter the defendant was seen by a neighbor driving through his trailer park. A boy was with him. The defendant did not go home then — possibly because his parents were there. Instead, sometime between 1:00 and 2:30 p.m., he went to the post office in Jersey, Georgia. He returned home alone about 3:00 p.m., and went to bed (he worked a night shift).

At 6:48 p.m. (as shown by the store's video camera) the defendant entered a Mr. B's convenience store and bought two packs of cigarettes.

The victim's body was discovered that evening in a small clearing just off a narrow dirt lane that runs from the Alcovy Trestle Road through heavy woods to the Alcovy River. His bicycle lay nearby. He had been beaten severely about the head and strangled to death.

The defendant was questioned about the homicide the next morning. He stated that he had got off work at 10:00 a.m. the previous day. He went to a fast-food restaurant and ate breakfast, drove to a liquor store and bought some whiskey, and then went to Kittle's grocery, where he played video games with two teenagers, including the victim. He stated that as he was leaving, the victim asked him for a ride to his sister's house in Porterdale, and the defendant offered to take him as far as Mr. B's convenience store on Highway 81 where he intended to buy some cigarettes. He arrived at Mr. B's between 12:00 and 1:00 p.m., dropped off the victim, and entered the store, purchas-

---

[1] The crime was committed on August 8, 1986. The defendant was arrested the next day. The case was tried March 2 through March 4, 1987. The death sentence was imposed March 4, and a motion for new trial was filed March 11. The motion was heard and denied July 7, 1987. A notice of appeal was timely filed, and the case was docketed in this court on September 30, 1987. The parties were given extensions of time to file their briefs, and the case was orally argued January 11, 1988.

ing his cigarettes from a certain cashier who worked there. Then he went home, bathed, and went to bed. He denied ever having been on the dirt lane where the victim's body was found.

The defendant gave several statements that day and the next. Each was essentially the same. Although he was asked each time to describe in detail his activities on the day of the crime, he never mentioned driving through his trailer park with the boy in his vehicle, or having gone to the post office in Jersey, or having been in Mr. B's convenience store at 6:48 p.m.

It was shown that the cashier at Mr. B's from whom the defendant claimed to have purchased his cigarettes early in the afternoon of August 8 did not work at all that day. The cashiers who did work that day remembered that he stopped by that evening, but could not remember his being there at any other time that day.

Investigators at the crime scene discovered a stump, obscured by vegetation, on the right hand side of the lane, opposite the small clearing on the left where the victim's body was found. It appeared to have been damaged recently. The state theorized that someone attempting to turn around in the narrow lane by backing into the clearing could have run over the stump. A piece of chrome trim, a wire clip, and a chip of Ford Bahama Blue paint were found next to the stump.

The defendant's Ford truck was observed to have been damaged on its lower right front fender. A piece of chrome trim was missing from the bottom of the fender. Two retainers for the missing chrome trim remained on the fender; attached to one of these retainers was a wire clip identical to the one found at the crime scene, while the other retainer was missing its wire clip. A fresh leaf was caught in one of the retainers. It was identified by a botanist as having come from a Japanese Honeysuckle plant, like that growing around the stump.

The chrome trim piece found at the crime scene fit the fender of the defendant's truck, and its ribbed design matched the chrome trim on the bottom of the door. The paint on the defendant's truck, a small amount of paint on the trim piece, and the paint chip found near the stump were all microscopically and chemically analyzed and determined to be Ford Bahama Blue.

Between the crime scene and the town of Jersey, a stick, covered with electrical tape, similar to one the defendant commonly carried in the gunrack of his pickup, and consistent with having caused the injuries to the victim's head, was found by the side of the road. Abraded into a part of the surface of this stick was Ford Bahama Blue paint.

2. The indictment charged both malice murder and felony murder. The jury found the defendant guilty on both counts. The evidence, although circumstantial, is sufficient to establish beyond a reasonable doubt the defendant's guilt of the offense of malice murder.

*Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). He contends the evidence fails to support his conviction for felony murder because the aggravated assault with a deadly weapon (the stick) did not kill the victim; the cause of death was ligature strangulation. This contention is moot, inasmuch as he was sentenced only on the malice murder count, and the felony-murder conviction stands vacated by operation of OCGA § 16-1-7 (a).

3. The trial court did not err by admitting Kittle's testimony concerning the defendant's threats toward his ex-wife and her male companion. He made these threats just before he met the victim. These " 'acts and words of the defendant [were] so close in time to the alleged offense as to have a bearing upon his state of mind at that time.' " *Walraven v. State*, 250 Ga. 401, 408 (297 SE2d 278) (1982) (quoting *Commonwealth v. Boulden*, 116 A2d 867, 873 (Penn. Super. Ct. 1955)). See *Frazier v. State*, 257 Ga. 690 (16) (362 SE2d 351) (1987).

4. The defendant contends the trial court erred by allowing in evidence state's exhibit three, the stick found by the side of the road between the crime scene and Jersey. Several witnesses testified that the stick looked similar to one commonly carried by the defendant prior to the murder. After the murder, the defendant no longer had the stick and told his interrogators that he could not remember what had happened to it. It was established that abraded onto the stick was Ford Bahama Blue paint, the same color as that on the defendant's truck. The autopsist testified that the wounds to the victim's head were consistent with having been inflicted by a weapon such as state's exhibit three. In these circumstances, the exhibit was properly admitted. *Jung v. State*, 237 Ga. 73 (1) (226 SE2d 599) (1976); *Harper v. State*, 251 Ga. 183 (1) (304 SE2d 693) (1983).

5. The defendant did not object to testimony that he had admitted having but "two female dates" in the eighteen months prior to the crime. The prosecutor argued from this and other evidence:

> I don't know why [the defendant] took a stick and beat him about the head. . . . A reasonable conclusion that could be drawn is sexual advancement. Why else do you take somebody out on a dirt road like that, a country road? But that might not be. That might not be right. There is no evidence of sexual molestation. It fits with the demeanor of the boy, his personality, that if he was approached about that, he would stand up and say no and if somebody's on the edge, like the defendant was that morning, yeah, it could trigger an explosion possibly. . . . I know if it was a sexual advancement, common sense would tell you that if he did make a sexual advancement on the boy and the boy said no and he

had to take the stick and hit him one time, what was he going to do then? . . . Could he just say, well fine, I'm just going to drive out of here and forget this? Because that boy is going to regain consciousness; he's going to walk out of there; he's going to tell everybody. Where does that leave the defendant? So in his mind he's only got one choice: I've got to kill this person. Logical. . . .

The motive for the killing, or lack thereof, was proper subject matter for the closing arguments of both the prosecution and the defense. The state's argument was based on the evidence and was not, as the defendant contends, improper. See *Conner v. State*, 251 Ga. 113 (6) (303 SE2d 266) (1983).

6. On March 24, 1987, the Tuesday before the trial was to begin the next Monday, the district attorney and the defendant's attorney went to the state crime lab, talked to the state's experts, picked up all the evidence and returned to Newton County. On Wednesday, the district attorney reviewed the evidence with the GBI agents who investigated the case. They realized that no comparison or identification had been performed with respect to the leaf caught in the fender of the defendant's truck. The district attorney called the defendant's attorney and informed him that he planned to take that leaf and several from the vicinity of the stump to a botanist employed by the Department of Fish and Game. The botanist examined them microscopically and on Friday the district attorney wrote a report dictated to him by the botanist, had the botanist sign it, and furnished a copy to the defendant.

The defendant responded by filing a motion to exclude any testimony by the botanist on the ground that the written scientific report was not furnished at least 10 days before the trial pursuant to OCGA § 17-7-211. The trial court denied the motion to exclude, but agreed to provide funds to the defendant to enable him to retain the services of his own botanist.

The defendant contends the court's ruling was error. We do not agree. As we pointed out in *Law v. State*, 251 Ga. 525, 527-28 (307 SE2d 904) (1983),

If the prosecuting attorney furnishes a copy [of the scientific report] but not in the time frame specified, there is nothing in the statute to require exclusion of the document from evidence. Perhaps late furnishing of a copy will mean the defendant is entitled to a continuance or recess of the trial as the trial judge may determine. . . . Only where the prosecuting attorney fails altogether to furnish the document does the exclusionary rule apply.

Here, the report was provided, and the defendant's attorney stated specifically that he was not moving for and did not want a continuance. Moreover, he declined the proffer of expert assistance, stating:

I have no reason to doubt the . . . credentials [of the state's botanist] and I think I can probably tell it's the same sort of plant, too, looking through a microscope. So I'm not sure that's going to add that much to it, one way or the other.

The trial court properly denied the motion to exclude the testimony of the botanist.

7. The evidence did not warrant a charge on voluntary manslaughter, and the trial court did not err by refusing to give one.

8. The court's charge on implied malice was not burden shifting. See *Welch v. State*, 254 Ga. 603 (5) (331 SE2d 573) (1985).

9. Our Code provides that, in capital cases,

[i]f more than two regular terms of court are convened and adjourned after the term at which the demand [for trial] is filed and the defendant is not given a trial, then he shall be absolutely discharged and acquitted of the offense charged in the indictment. . . .

Newton County has four regular terms of court each year, beginning on the second and third Mondays in January, April, July and October. OCGA § 15-6-3 (2) (A). The length of these terms is specified in OCGA § 15-6-19: "The regular terms of the superior and state courts *shall continue* until the commencement of the *next regular term*, at which time they shall stand adjourned." (Emphasis supplied.)

The defendant filed a demand for trial during the July 1986 term of the Newton Superior Court. He was tried during the January 1987 term of court — i.e., during the second regular term of court following the term in which his demand was filed. Notwithstanding that special juries had been empaneled in the interim, pursuant to OCGA § 15-6-20, the defendant was given a trial before "more than two regular terms of court [were] convened and adjourned after the term at which the demand [was] filed. . . ." OCGA § 17-7-171 (b). There is no merit to his contention that he is entitled to an acquittal because the state did not try him soon enough.

10. The defendant complains that the state's cross-examination of his mother at the sentencing phase of the trial incorporated a report from the Department of Family and Children Services (DFACS) that was inadmissible as a consequence of the state's non-compliance with the notice provisions of OCGA § 17-10-2. The state counters that (1) the defendant had a copy of this report "months before trial," and

(2) in any event, the report was neither mentioned nor introduced in evidence.

The mother testified as to the defendant's non-violent nature. The state's cross-examination concerned the defendant's previous conviction for terroristic threats wherein he had threatened to kill the welfare worker assigned by the juvenile court to monitor the defendant's family situation, and to burn down the building where he worked. See OCGA § 16-11-37 (a).

The defendant was properly notified of the state's intention to use the prior conviction in aggravation, and the conviction was in evidence when the state cross-examined the defendant's mother. But even if the cross-examination was based in part on the DFACS report (and not just the conviction), and even if there was not sufficient compliance with OCGA § 17-10-2 respecting this report to allow the state to use the report in its case-in-chief, the state's use of this report to rebut the mother's direct testimony was not barred by OCGA § 17-10-2. *Buttrum v. State*, 249 Ga. 652 (9) (293 SE2d 334) (1982). See also *Cook v. State*, 255 Ga. 565 (17 g) (340 SE2d 891) (1986).

11. The state contended at trial that the offense of murder was committed while the offender was engaged in the commission of the offense of aggravated battery. OCGA § 17-10-30 (b) (2). The court instructed the jury on this statutory aggravating circumstance as follows:

> The State contends that the offense of murder in this case was committed by the Defendant while he was engaged in the commission of an aggravated battery upon the body of the murder victim. Under our law, this is a statutory aggravating circumstance which would authorize, but not mandate, the imposition of the death penalty.
>
> The State has the burden of proving this statutory aggravating circumstance beyond a reasonable doubt.
>
> I charge you that a person
>
> commits aggravated battery when he maliciously, that is to say, with intent, causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof.
>
> I charge you that in order for you
>
> to find the existence of this statutory aggravating circumstance, you must find that the aggravated battery, if any, occurred prior to the victim's death. In other words, in deter-

mining whether or not an aggravated battery was committed upon the body of the murder victim, you may only consider facts occurring prior to the victim's death.

That is, insofar as aggravated battery is concerned, only facts which are separate from and occurring prior to the act causing instantaneous death will support a finding of aggravated battery.

If you find beyond a reasonable doubt that this statutory aggravating circumstance exists, then your verdict should reflect this finding.

Whether or not the statutory aggravating circumstance, which I have just given you in charge, exists beyond a reasonable doubt in this case, is a matter solely for you, the members of the jury, to decide and to determine from the evidence in this case.

(a) The evidence shows that the victim was struck twice in the head with a heavy stick and then strangled to death with a ligature. One blow to the head left a severe bruise on the victim's left cheek and ear. The other blow lacerated his scalp and fractured his skull. The evidence was sufficient to establish the commission of an aggravated battery, *Baker v. State*, 245 Ga. 657 (6) (266 SE2d 477) (1980); *Thompson v. State*, 156 Ga. App. 1 (1) (273 SE2d 894) (1980), and to establish that "the aggravated battery . . . precede[d] the killing and [was] a separate and distinct act from the act causing death. . . ." *Davis v. State*, 255 Ga. 588, 593 (3 c) (340 SE2d 862) (1986).

(b) The court did not err, as the defendant contends, by failing to define the phrase ". . .engaged in the commission of. . . ." The defendant did not request any elaboration of this phrase and it is self-explanatory. See *Romine v. State*, 251 Ga. 208, 214 (8) (305 SE2d 93) (1983).

(c) Nor did the court err by refusing to give the defendant's request to charge the jury that it could find the statutory aggravating circumstance only if it found beyond a reasonable doubt that the victim remained fully conscious after the blows to the head. *Davis v. State*, supra.

(d) Malice is an essential element of the offense of aggravated battery. *Taylor v. State*, 178 Ga. App. 817 (2) (344 SE2d 748) (1986). Concerning this element, the trial court instructed the jury that the offense of aggravated battery is committed when the defendant causes the specified injuries "maliciously, that is to say, with intent. . . ."

This instruction was erroneous. A person acts "maliciously" when he acts intentionally *and* without justification or serious provocation. See *Francis v. Franklin*, 471 U. S. ___ (105 SC 1965, 1974, 85 LE2d 344) (1985). Compare former §§ 26-1201 through 26-1210 of the 1933

Code, defining the offense of mayhem, the progenitor of the crime of aggravated battery. *Mitchell v. State*, 238 Ga. 167, 168 (231 SE2d 773) (1977). What the court should have said was: "maliciously, that is to say, intentionally and without justification or serious provocation. . . ." The instruction given, by its incompleteness, "removed from the prosecution the burden of proving every element of the crime [of aggravated battery] beyond a reasonable doubt." *Davis v. Kemp*, 752 F2d 1515, 1521 (11th Cir. 1985) (en banc).

The state argues that any error is harmless, noting that the jury convicted the defendant of malice murder under guilt-phase instructions correctly defining the term "malice," and that in any event the real dispute was whether the defendant was involved in the death of the victim, and not whether he acted maliciously.

The defendant's conviction for malice murder did not relieve the state of its burden to prove beyond a reasonable doubt at the sentencing phase of the trial that the defendant had committed the *separate* crime of aggravated battery, *Romine v. State*, 256 Ga. 521, 528 (350 SE2d 446) (1986), and we cannot agree that the jury's return of a verdict of guilty of murder renders harmless an erroneous sentencing-phase charge on the sole statutory aggravating circumstance relied upon by the state to obtain a death sentence on the murder conviction.

The more relevant inquiries are: (1) Is the evidence that the defendant committed an aggravated battery overwhelming? (2) If not, does the evidence overwhelmingly establish at least the element of the crime to which the erroneous instruction was applied? *Godfrey v. Kemp*, ____ F2d ____ (11th Cir. No. 85-8570, decided January 20, 1988); *Davis v. Kemp*, supra at 1521 (fn. 10). We cannot say on this record that the evidence *overwhelmingly* establishes the defendant's guilt of the offense of aggravated battery, and we cannot say that it *overwhelmingly* establishes the existence of the element of malice. The evidence is sufficient in both respects, but it does not overwhelm. More importantly, where the conviction of murder rests upon evidence barely meeting the standard required by *Jackson v. Virginia*, supra, and the death penalty was imposed, error in a charge is less likely to be harmless. Therefore, we cannot say that the erroneous charge was harmless beyond a reasonable doubt, and the death sentence must be reversed.

12. The jury's initial sentencing verdict read: "We unanimously find the following statutory aggravating circumstances beyond a reasonable doubt: brutally beaten on head prior to death by strangulation . . . We unanimously fix the penalty as death."

The court instructed the jury:

Ladies and gentlemen, the verdict is not the verdict which

would stand in law. We think we understand what it is that you're attempting to do but the verdict cannot be written and announced as you have attempted to write it . . . [T]he verdict has to be in a certain form.

After further deliberations, the jury returned a verdict in proper form specifying the commission of an aggravated battery as set forth in OCGA § 17-10-30 (b) (2).

The jury's initial verdict was "uncertain and ambiguous," and the trial court did not err, as the defendant contends, by returning the jury to the jury room for further deliberations. *Quick v. State*, 256 Ga. 780 (7) (353 SE2d 497) (1987); *Westbrook v. State*, 256 Ga. 776 (5) (353 SE2d 504) (1987). The trial court expressed no opinion violating OCGA § 17-8-57.

13. The conviction is affirmed. The death sentence is reversed. The case is remanded for resentencing.

*Judgment affirmed in part, reversed in part. All the Justices concur, except Weltner, J., who concurs in the judgment only as to Division 11.*

DECIDED MAY 26, 1988 —
RECONSIDERATION DENIED JUNE 22, 1988.

*Strauss & Walker, John T. Strauss,* for appellant.
*John M. Ott, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,* for appellee.