## S98P1890. SEARS v. THE STATE.
(514 SE2d 426)

THOMPSON, Justice.

A jury convicted Demarcus Ali Sears of kidnapping with bodily injury and armed robbery, and imposed a sentence of death. The evidence adduced at trial showed that Sears and Phillip Williams kidnapped the victim, Gloria Wilbur, as she left a supermarket in Cobb County, Georgia; that Sears assaulted Ms. Wilbur with brass knuckles, put her in her car and drove north; that Sears raped Ms. Wilbur in Tennessee; and that he killed her in Kentucky by stabbing her with a knife.

In *Sears v. State*, 268 Ga. 759 (493 SE2d 180) (1997), we affirmed Sears' convictions, but remanded the case to the trial court to allow Sears an opportunity to conduct an investigation and present evidence on his claim of jury coercion and misconduct in the sentencing phase. Because the result of the proceedings on remand calls for further appellate review, we now address the remaining enumerations

[13] 476 U.S. 683, 688-690 (106 SC 2142, 90 LE2d 636) (1986).
[14] Ga. Super. Ct. Pattern Jury Instructions (Criminal) (IV) (B) (13) (b).

of error. See id. (18).

Each of the remaining enumerations attacks the validity of the jury's verdict and the death sentence entered in this case. Finding no error, we affirm the imposition of the death sentence.

1. After deliberating for approximately six hours in the sentencing phase, the jury sent the trial court a note announcing that it was deadlocked eleven to one in favor of the death penalty, and asking how it should complete the verdict form. Over Sears' objection, the trial court responded to the note as follows:

> You all have been deliberating on this case for six hours. I would like you all to consider continuing your deliberations and see what you can do with the case. I'm not putting any pressure on you to [do] anything one way or another. Whatever your decision is, that's [your] decision. But I feel like you need to deliberate on the case longer.

The jury resumed its deliberations and continued deliberating for another three hours. At that point, the jury sent a second note which read:

> [W]e have reviewed the case from start to finish and we are still deadlocked eleven to one in favor of the death penalty. All twelve jurors agree that there is a hopeless deadlock with no hope of resolution. Deliberations have ceased. What do we do now? All minds are closed.

Sears urged the trial court to accept the jury's "verdict" and impose a life sentence. The court declined to do so. Instead, it charged the jury, in part, as follows:

> I believe it's appropriate to give you some further instructions at this time. You've been deliberating a while, and I deem it proper to advise you further in regards to the desirability of agreement, if possible. This case has been exhaustively and carefully tried by both sides. It has been submitted to you for a decision and verdict, if possible. While the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard and deference to the opinion of each other. A proper regard for the judgments of others will greatly aid us in forming our own judgments. Each juror should listen to the arguments of other jurors. If the members of the jury differ in their views of the evidence, or the

mitigating or aggravating circumstances, such differences of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion. It's your duty to decide the issues that have been submitted to you, if you can conscientiously do so. Do not hesitate to change an opinion if you become convinced it's wrong. However, you should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors.

The jury was then excused for the evening. It reconvened the following morning and resumed its sentencing phase deliberations. After an hour and a half, the trial court informed counsel that one of the jurors had been sitting in the jury room with a Sony Walkman on her head; and that she had been asked to give it to the bailiffs "so she could participate in the deliberations." The court also told counsel that the foreman had asked the bailiffs to remove all magazines and reading material from the jury room. In addition, the court stated that it had received two notes from the jury: one from the foreman and another from juror Angel Fisher. The note from the foreman, which contained blanks instead of personal pronouns to "protect the gender of the juror" in question, read:

In the jury selection process, each juror was read the charges in this case. Murder was not one of the charges. The reason that the juror who has steadfastly maintained [ ] position from the outset of deliberations has given for [ ] decision is that [ ] cannot vote on the death penalty because the Defendant was not convicted of murder. Can you provide the jury with a transcript of the questions and answers as to their position on the death penalty? We need to know what questions were asked and how the jurors responded. We would also like for you to provide to the jury a definition of perjury and the penalty for the commission of perjury.

The note from Fisher read:

I am concerned about the actions of the foreman of this jury. This letter is in reference to the foreman's most recent letter to you. [The foreman] wrote this letter prior to our jury deliberations today. He informed us that he was submitting the letter to you whether we wanted him to or not. I don't think this type of behavior is appropriate for a foreman. I will not sit on a jury where I am singled out. I am not being treated fairly in this deliberating process. I am also being singled out by the foreman, also he is overstepping his

boundaries as a foreman of a jury. To my understanding, a foreman should be a leader, not a dictator. Please explain the duties and responsibilities of a jury foreman. Should he be able [to] question a juror's response to the Court during jury selection?

The trial court brought the jury in and said it had received notes from the foreman and Fisher. It summarized the contents of the notes, and stated that the jury should recall the previous instructions as to the imposition of the death penalty, aggravating circumstances, and mitigating evidence. It then informed the jury that it would not read the voir dire transcript and it would not define perjury. The court went on to clarify the role of a foreman by stating that, although the foreman is responsible for leading the deliberations, "in matters of voting, all jurors stand the same." Finally, the court added:

> A juror is responsible to deliberate in the jury deliberations. A juror is supposed to listen to his or her fellow jurors. A juror is supposed to vote their ideas and positions. A juror is supposed to participate. It is inappropriate for any juror to do anything other than fully participate in jury deliberations.

The jury was sent back to deliberate further. Then, after two and a half hours of additional deliberations, the jury announced that it had reached a verdict. The jury entered the courtroom and returned its verdict, finding the alleged statutory aggravating circumstances beyond a reasonable doubt, and sentencing Sears to death. The jury was polled and each juror stated that the verdict was his or her verdict and that it was freely and voluntarily rendered.

Sears contends the trial court coerced the jury to render a verdict of death. Whether a verdict was reached as the result of coercion depends upon the totality of the circumstances. See *Jenkins v. United States*, 380 U. S. 445, 446 (85 SC 1059, 13 LE2d 957) (1965). An examination of the totality of the circumstances leads us to conclude that the verdict was not coerced by the trial court.

The jurors deliberated for more than fourteen hours over a period of three days before reaching their verdict. Each of the jurors stood by that verdict, announcing, upon being polled, that they rendered it freely and voluntarily in the jury room, and that it was still their verdict. See *Rouse v. State*, 265 Ga. 32, 34 (3) (453 SE2d 30) (1995). Although the trial court gave a modified *Allen* charge (see *Allen v. United States*, 164 U. S. 492 (17 SC 154, 41 LE 528) (1896); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986)), it cannot be

said that that charge was coercive. The court made it clear that, although the jurors should consider the opinions of other jurors, they must never surrender their honest opinions for the sake of expediency. See *Romine*, supra; cf. *Riggins v. State*, 226 Ga. 381, 384 (174 SE2d 908) (1970) (trial court remarked that some jurors were "being a little unreasonable, stubborn").

The trial court's other instructions, urging the jury to reach a consensus, and to participate in the deliberations, were not coercive either. They did not put pressure on the jurors "one way or the other," see *Romine*, supra at 525; they did not exhort "the minority to reexamine its views in deference to the majority, or to suggest that the majority's position is correct." *United States v. Norton*, 867 F2d 1354, 1366 (11th Cir. 1989). Nor did they urge the jurors "to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors. [Cit.]" *Harris v. State*, 263 Ga. 526, 528 (435 SE2d 669) (1993).

Although the jury twice stated that it was at an eleven to one "deadlock," the trial court was not bound by those pronouncements. *Todd v. State*, 243 Ga. 539, 542 (255 SE2d 5) (1979) (court is not required to accept jury's feeling that it is "hopelessly deadlocked"). On the contrary, the trial court, in the exercise of a sound discretion, was required to make its own determination as to whether further deliberations were in order. *Romine*, supra at 524.

The jury first indicated it was deadlocked after only six hours of deliberation. And it announced it was deadlocked again, after just another three hours. We cannot say that the trial court abused its discretion in requiring the jury to deliberate further, see *United States v. Kramer*, 73 F3d 1067 (11th Cir. 1996) (jury not deadlocked after deliberating seven days); *Holt v. State*, 192 Ga. App. 708, 709 (385 SE2d 787) (1989) (jury not deadlocked after four days, "more time than it had taken to try the case"), especially since, after the second announcement of a "deadlock," the jury deliberated more than five hours before reaching a verdict. See *Allen v. State*, 260 Ga. 147, 148 (390 SE2d 848) (1990) (fact that *Allen* charge was not coercive can be inferred from length of time jury continues to deliberate); *United States v. Norton*, supra (lapse of four hours following *Allen* charge suggests absence of coercion). Moreover, it cannot be said that the verdict was coerced simply because the trial court gave a modified *Allen* charge after the jury revealed its numerical division (11-1 in favor of the death penalty). See id.; *Sanders v. United States*, 415 F2d 621, 631-632 (5th Cir. 1969) (court should not be precluded from giving *Allen* charge because jury volunteered nature and extent of its

division).[1]

Sears contends the testimony of juror Fisher, adduced upon remand, demonstrates that the actions of the trial court had a coercive effect upon her verdict. In this regard, Sears points out that Fisher testified she was afraid of being prosecuted for perjury, and she believed the trial court wanted her to change her vote because it singled her out by name and urged the jury to continue deliberating when it knew the nature of the jury's numerical division. We cannot accept this contention.

Fisher, a school teacher, had a bachelor's degree in criminal justice and had attended graduate school. She was the lone holdout for a life sentence — until she changed her mind. Although she testified that she felt bullied by the threat of perjury, she knew that she had not lied under oath. She felt intense pressure from the other jurors. ("I remember being yelled at basically because I was — they were angry at me. They wanted me to change my mind. So they were insulting my character and things like that.") Ultimately, she gave in to that pressure. ("I changed my mind because they had — I mean I was ostracized. And I was just — I was basically made to change my mind by the other jury members.") Viewing Fisher's testimony as a whole, it is clear that she voted for the death penalty because she felt pressured to do so only as a result of the "normal dynamic of jury deliberations." *United States v. Cuthel*, 903 F2d 1381, 1383 (11th Cir. 1990).

2. Sears contends he is entitled to a new trial because juror Kenneth Makant failed to disclose certain information on his juror questionnaire; and he injected that information into the jury's deliberations. More specifically, Sears asserts that the juror questionnaire asked whether any member of a juror's family had been the victim of a violent crime; that Makant responded to that question negatively; that, in so doing, Makant lied because his daughter had been the victim of a rape; and that, during the jury's deliberations, Makant disclosed the fact that his daughter had been raped.

The question at issue, No. 28, reads as follows:

Have you or any member of your family or any close friend ever been the victim of a violent crime?
What was the crime:
Was anyone arrested in connection with the crime:
Was anyone convicted of the crime:

---

[1] Trial courts should not, of course, inquire as to the nature of a jury's numerical division. *United States v. Norton*, supra at 1365. And we encourage them to inform jurors not to reveal that information. See *Romine*, supra at 522; *Wilson v. State*, 145 Ga. App. 315, 320 (244 SE2d 355) (1978).

At the hearing on remand, juror Makant testified that he answered the question truthfully. In this regard, he averred that he looked at the question as a whole and thought "that it meant it in the context had there been any conviction or, you know, court proceeding on it." Continuing his testimony, Makant stated that he answered the question in the negative because, although his daughter had been raped by her brother-in-law when she was 13 years old, the crime was not reported and no one was arrested or convicted. He added that at the time he completed the juror questionnaire, he did not know what offenses he would be asked to try. Finally, Makant averred that the rape of his daughter did not prevent him from being a fair and impartial juror.

In order for a defendant to secure a new trial because a juror did not give a correct response to a question posed on voir dire (or, as here, a juror questionnaire), the defendant must show that the juror failed to answer the question truthfully and that a correct response would have been a valid basis for a challenge for cause. *Royal v. State*, 266 Ga. 165, 166 (2) (465 SE2d 662) (1996); *Gardiner v. State*, 264 Ga. 329, 333 (3) (444 SE2d 300) (1994); *Isaacs v. State*, 259 Ga. 717, 740 (44) (e) (386 SE2d 316) (1989). The evidence does not show that Makant lied when he answered question No. 28. Instead, it shows that he answered the question truthfully, as he understood it. See *Dyer v. Calderon*, 151 F3d 970 (9th Cir. 1998) (jurors must answer truthfully but "we must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment"). Even if it could be said that Makant lied, a correct response to the question would not have provided a valid basis for a challenge for cause. *Isaacs*, supra at 741; see *Grogan v. State*, 230 Ga. App. 876, 878 (497 SE2d 589) (1998) (correct response would have only allowed for exercise of peremptory strike, not a challenge for cause).

3. Sears asserts he was denied a fair trial because of two instances of alleged juror misconduct in the jury room: (a) Makant's injection of his daughter's rape and (b) the foreman's statement that juror Fisher should be prosecuted for perjury.

(a) The fact that juror Makant injected his daughter's rape into the jury's deliberations is of no import. Makant testified that he only raised the issue because he believed the holdout juror was not taking the deliberations seriously. Besides, the circumstances of the rape of Makant's daughter differed markedly from the kidnapping, rape and murder in this case. It cannot be said that Makant's behavior in the jury room rose to the level of juror misconduct. See *Hilburn v. Hilburn*, 163 Ga. 23, 24 (135 SE 427) (1926) (jurors must bring their life experiences to the jury room). See also *Oliver v. State*, 265 Ga. 653, 654 (3) (461 SE2d 222) (1995) (jurors' limited discussion of news

story about murder of state's witness did not provide basis for new trial).

(b) As the deliberations became more heated, the foreman stated that juror Fisher must have been lying when she responded to voir dire questions concerning her willingness to impose the death penalty, and that she should be prosecuted for perjury. These statements do not amount to juror misconduct. Compare *People v. Redd*, 561 NYS2d 439, 440 (AD 1 Dept. 1990) (threats and belligerent exchanges in the course of deliberations often accompany the heightened atmosphere in the jury room and are insufficient to upset the verdict) with *People v. Lavender*, 502 NYS2d 439 (AD 1 Dept. 1986) (new trial warranted where court takes no action after it is apprised that juror was trying to physically attack co-juror).

4. Sears challenges the authority of the state to impose the death penalty for kidnapping with bodily injury on the grounds that (1) the kidnapping with bodily injury offense was completed when he first abducted the victim and hit her with brass knuckles, and (2) he was not convicted of murder.

The offense of kidnapping with bodily injury is a capital felony. OCGA § 16-5-40 (b). It requires an unlawful abduction and the infliction of some bodily injury. *Pryor v. State*, 238 Ga. 698, 701 (234 SE2d 918) (1977). We have previously held that a defendant may receive a death sentence for kidnapping with bodily injury when the victim is killed. *Stanley v. State*, 240 Ga. 341, 350 (241 SE2d 173) (1977). See also *Tharpe v. State*, 262 Ga. 110, 115 (416 SE2d 78) (1992) (kidnapping with bodily injury is a capital felony that may be considered as an aggravating circumstance supporting a death sentence for murder). Thus, we concluded in *Potts v. State*, 261 Ga. 716 (410 SE2d 89) (1991), that a jury could impose a death sentence when the offense of kidnapping with bodily injury was committed while the defendant was engaged in the commission of the capital felonies of murder and armed robbery. Id. at 726.

In this case, Sears was indicted for kidnapping Ms. Wilbur and inflicting bodily injury upon her by striking her with brass knuckles, and stabbing her to death with a knife. There is no basis for Sears' contention that the stabbing could not constitute part of the bodily injury in the kidnapping charge. As a matter of law, bodily injury does not have to be inflicted at the same moment as the initial abduction. *Potts*, 261 Ga. at 720 (victim seized in one county and bodily injury inflicted in another). See also *Pryor*, 238 Ga. at 701-702; cf. *Diamond v. State*, 267 Ga. 249, 250 (477 SE2d 562) (1996) (holding that defendant was still in the commission of a burglary, despite its technical completion, when she caused the death of three persons during a police chase that began at the scene of the burglary).

The jury found beyond a reasonable doubt that the offense of kid-

napping with bodily injury was committed while Sears was engaged in the commission of armed robbery, rape, and murder. As in *Potts*, the murder was sufficiently a part of the same criminal transaction as the kidnapping, despite occurring in a different state, to be considered a statutory aggravating circumstance in support of the death penalty. See *Heath v. Jones*, 941 F2d 1126 (11th Cir. 1991) (defendant could be convicted of murder during a kidnapping and sentenced to death in Alabama, despite the fact that the murder occurred in Georgia). See also *Sallie v. State*, 216 Ga. App. 502, 503 (455 SE2d 315) (1995) (crossing county line with two kidnapping victims merely continued the asportation and detention required for defendant's conviction of kidnapping with bodily injury).

5. Sears objects to the testimony of two witnesses, Detective Laurie Bello and Major Jim Burns. The former witness testified that Sears lacks remorse. The latter, a Cobb County jailor, testified that he became familiar with Sears in the three years that Sears had been in jail and that Sears' reputation in the jail was bad — in fact, in his seventeen years of experience, Major Burns could not remember an inmate who had caused more trouble. The prosecutor asked each of these witnesses if they would believe anything Sears said under oath and they both replied, "No."

During the penalty phase, "[a]ny lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes is admissible in aggravation, subject to the notice provisions of [OCGA § 17-10-2]." *Fair v. State*, 245 Ga. 868, 873 (268 SE2d 316) (1980). This aggravating evidence may also include a defendant's conduct after incarceration. See id. Since the record reflects that the state provided Sears with pretrial notice of intent to produce this evidence in aggravation, we conclude that the evidence was admissible.

6. The jury found as aggravating circumstances that the kidnapping with bodily injury was committed while Sears was engaged in the capital felonies of armed robbery, rape and murder, OCGA § 17-10-30 (b) (2), and that the kidnapping with bodily injury was outrageously vile, wantonly vile, horrible and inhumane, in that it involved torture, depravity of mind, and aggravated battery to the victim. OCGA § 17-10-30 (b) (7). Sears contends the jury's aggravating circumstance findings were improper because (a) the state failed to give notice of its intent to seek the (b) (7) circumstance before trial; and (b) the verdict form was arranged as a checklist. We disagree.

(a) The state filed a notice of intent to seek the death penalty listing three OCGA § 17-10-30 (b) (2) aggravating circumstances and "any others which may be supported by the evidence upon the trial of said case." In a pretrial motion, Sears objected to the catch-all phrase at the end of the state's notice of intent and sought to compel the

state to reveal all of the statutory aggravating circumstances upon which it would rely. The trial court denied the motion, but the state promised that it would notify the trial court of any additional statutory aggravating circumstances "if any became known." Subsequently, while the jury was deliberating in the guilt phase, the state notified Sears that it would seek the (b) (7) aggravating circumstance. The trial court did not err in permitting the jury to consider that aggravating circumstance. It is not incumbent upon the state to notify a defendant prior to trial of every statutory aggravating circumstance that it might seek to prove. *Roberts v. State*, 252 Ga. 227, 240 (314 SE2d 83) (1984); *Bowden v. Zant*, 244 Ga. 260, 263-264 (260 SE2d 465) (1979).

(b) OCGA § 17-10-30 (b) (7) reads as follows: "The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The statute is worded in the disjunctive, requiring the jury to find that "at least one phrase of the first clause of the statute exists due to the existence of at least one phrase of the second clause of the statute." *Fair v. State*, supra at 872 (3).

The record reveals that the trial court properly instructed the jury on the relationship of the clauses. Moreover, the verdict form accurately reflects the language of the statute; and the jury marked the form in such a way as to indicate that it found the existence of all of the (b) (7) factors beyond a reasonable doubt. It cannot be said that the verdict form was erroneous simply because it set forth the (b) (7) factors in the form of a checklist.

7. Sears challenges several jury instructions in the sentencing phase.

(a) Sears contends that the court's instructions allowed the jury to impose the death sentence if any of four aggravating circumstances were found and did not make it clear that a death sentence could be returned only if the jury found beyond a reasonable doubt that Sears committed murder. A review of the record reveals, however, that in addition to charging on murder as a statutory aggravating circumstance, the trial court also charged that "the sentence of death shall not and cannot be imposed unless you find beyond a reasonable doubt that the defendant either committed the murder, attempted to kill the victim, or intended that deadly force be used by another to accomplish the criminal enterprise." Although a mere attempt to kill would not justify the death penalty, any error in this regard was harmless. The overwhelming evidence established that the victim died from wounds inflicted by Sears, thus satisfying the requirement that a death sentence be imposed only upon a finding beyond a reasonable doubt that the defendant committed murder.

*Stanley v. State*, 240 Ga. at 350. Further, we note that the jury made a specific finding beyond a reasonable doubt that Sears committed the offense of kidnapping with bodily injury while engaged in the commission of murder.

(b) The trial court charged the jury on the statutory definition of murder, but did not define "malice aforethought." We agree that the trial court should have defined malice, which is an essential element of murder. See *Wade v. State*, 258 Ga. 324, 330-331 (368 SE2d 482) (1988). However, Sears did not request such a charge and the evidence was overwhelming that the killing took place intentionally and without justification or serious provocation. See OCGA § 16-5-1 (b). Therefore, the failure to define malice does not require reversal.

(c) In its charge, the trial court repeatedly linked the (b) (7) factors with murder instead of kidnapping with bodily injury. On several occasions the court immediately corrected itself; on others, however, it did not. Sears asserts the trial court's charge was erroneous and misled the jury because it was left with the impression that it was to examine the (b) (7) factors with the murder in mind. We disagree. The trial court's references to murder, instead of kidnapping with bodily injury, were a mere slip of the tongue. Viewing the charge as a whole, it cannot be said that the trial court's verbal inaccuracies misled or confused the jury. *Conner v. State*, 251 Ga. 113, 117 (4) (303 SE2d 266) (1983). Moreover, the verdict form made it abundantly clear that the (b) (7) factors were to be applied only with regard to kidnapping with bodily injury.

(d) *Jarrell v. State*, 261 Ga. 880, 882-883 (413 SE2d 710) (1992), does not require a trial court to charge that the (b) (2) separate offense must have been committed at the same time as the capital offense. Therefore, the trial court did not err in charging that the jury could find the existence of a (b) (2) circumstance if the offense of kidnapping with bodily injury was committed while the offender was engaged in the commission of another capital felony.

(e) Sears asserts the trial court's charges on mitigation and aggravation require reversal because they did not adequately address the issue of "unanimity." We disagree.

(i) Although the trial court failed to charge the jury that a finding of mitigating circumstances need not be unanimous, it did charge that "it is not required and it is not necessary that you find any extenuating or mitigating . . . circumstances" in order to return a life sentence. Viewed as a whole, the charge did not impose a unanimity requirement for mitigating circumstances. See *Ledford v. State*, 264 Ga. 60, 69 (439 SE2d 917) (1994).

(ii) The trial court did not specifically instruct the jury that its findings with regard to aggravating circumstances must be unanimous. However, it did instruct that the verdict as to penalty must be

unanimous. Therefore, reversal is not required on this ground. See *Davis v. State*, 263 Ga. 5, 9 (15) (426 SE2d 844) (1993).

(f) In explaining rape as the second alleged aggravating circumstance, the trial court charged "[c]arnal knowledge and rape occurs when there is any penetration of the female sex organ by the male sex organ." This statement does not require reversal because the trial court also correctly charged that an element of rape is that it occur "forcibly and against [the victim's] will"; and because consent was not a defense raised in the case.[2]

(g) The trial court correctly instructed the jury on venue for kidnapping with bodily injury by charging that "[t]here's no requirement that the bodily injury be inflicted in the venue where the person was seized." See *Krist v. State*, 227 Ga. 85, 91 (179 SE2d 56) (1970).

8. "The test on review for allegedly improper arguments by the state to which the defense did not object at trial is 'whether the improper argument in reasonable probability changed the result of the trial.' *Todd v. State*, 261 Ga. 766 (2) (410 SE2d 725) (1991)." *Ledford v. State*, supra at 68. We find no such reasonable probability with respect to the prosecutor's closing argument in this case.

9. As we held on interim appellate review, the trial court did not err in denying Sears' pretrial motion for a psychiatric evaluation between the guilt and sentencing phases of the trial. *Sears v. State*, 262 Ga. 805, 807 (5) (426 SE2d 553) (1993).

10. We do not find that Sears' death sentence was imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

11. Electrocution does not constitute cruel and unusual punishment in violation of the Eighth Amendment. *DeYoung v. State*, 268 Ga. 780, 786 (6) (493 SE2d 157) (1997).

12. The imposition of a death sentence in this case would not be excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c)

---

[2] After the case was docketed in this Court, the district attorney filed a motion to correct the record to reflect that the trial court charged that "carnal knowledge *in* rape occurs" rather than "carnal knowledge *and* rape occurs." The trial court granted the motion based on the affidavits of the prosecutors that they "recalled" that the court used the word "in" and not "and" and based on the trial court's statement that its habit was to use the word "in" instead of "and." Sears contends that this amendment constitutes error. While it is doubtful that the trial court had jurisdiction to consider this issue and change the transcript when the case was pending in this Court, see Unified Appeal Procedure, 246 Ga. Appendix at IV (B) 1 (after docketing in Supreme Court, superior court may be directed by Supreme Court to conduct further hearings), we need not decide the issue. Given the state's failure to seek the amendment until four years after the completion of the transcript, the fact that the court reporter's notes matched the transcript, and the presumption of correctness of the trial transcript, we have chosen to rely on the contemporaneously prepared record. Therefore, Sears' contention that the amendment of the record constitutes constitutional error is moot.

(3). The similar cases listed in the Appendix would support the imposition of the death sentence in this case.

*Judgment affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

APPENDIX.

*Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Lynd v. State*, 262 Ga. 58 (414 SE2d 5) (1992); *Potts v. State*, 261 Ga. 716 (410 SE2d 89) (1991); *Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *Ford v. State*, 255 Ga. 81 (335 SE2d 567) (1985); *Tucker v. State*, 245 Ga. 68 (263 SE2d 109) (1980); *Stanley v. State*, 240 Ga. 341 (241 SE2d 173) (1977).

FLETCHER, Presiding Justice, dissenting.

Because the trial court's instructions to the jury during its deliberations in the sentencing phase were improperly coercive, I dissent.

It is a fundamental precept that a jury's verdict should be reached freely, without coercion or undue pressure; the jury must be "free from any seeming or real coercion on the part of the court."[3] This Court and the United States Supreme Court have recognized that the concern for an uncoerced verdict is especially important in a capital sentencing trial, in which the state is seeking the ultimate punishment.[4] In reviewing a claim of jury coercion, an appellate court must examine the totality of the circumstances in order to determine if a trial court's statements were coercive.[5]

On the second day of deliberations and after six hours of deliberations in the sentencing phase, the jury sent the judge a note that announced that it was at an 11 to 1 deadlock in favor of death and asked how to fill out the verdict form. The trial court read the note in open court and told the jury to continue its deliberations. After a lunch break and another three hours of deliberating, the jury sent a second note reiterating a "hopeless deadlock with no hope of resolution" and stating that "all minds are closed." The trial court responded by giving an "Allen"[6] charge substantially similar to the one approved in *Romine v. State*[7] and dismissed the jury for the evening.

---

[3] *Riggins v. State*, 226 Ga. 381, 384 (174 SE2d 908) (1970); *Moore v. State* 222 Ga. 748, 753 (152 SE2d 570) (1966).

[4] See *Riggins*, 226 Ga. at 384; *Lowenfield v. Phelps*, 484 U.S. 231, 241 (108 SC 546, 98 LE2d 568) (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body").

[5] *Jenkins v. United States*, 380 U.S. 445, 446 (85 SC 1059, 13 LE2d 957) (1965).

[6] See *Allen v. United States*, 164 U.S. 492 (17 SC 154, 41 LE 528) (1896).

[7] 256 Ga. 521, 523 (350 SE2d 446) (1986).

The following morning at 9:00 a.m. the jury began its third day of deliberations in the sentencing phase. At 10:25 the trial court informed counsel that it had received a note from the foreman and one from juror Fisher. The note from the foreman sought a transcript of the voir dire and a definition of perjury and its penalties, even though perjury was not remotely relevant to the issues in the sentencing phase. The note from juror Fisher revealed that she felt that she was being singled out and specifically sought assistance from the trial judge in dealing with the foreman's threat to review Fisher's voir dire responses for perjury. In responding to these notes, the trial court identified Fisher by name. Despite the plea from Fisher alerting the trial court to the threats made against her, the trial court made only an ambiguous statement that it would not read the voir dire or define perjury.

These final two notes revealed a serious personal conflict within the jury room, which the evidence on remand confirmed. The foreman's note strongly suggests a threat of a perjury prosecution against the holdout juror based on her responses during voir dire. Fisher's note reveals that she was aware of the foreman's concerns regarding her voir dire answers and was seeking some assistance from the court. The other jurors were also made aware of the perjury threat and against whom it was made when the trial court revealed the contents of the notes in open court before the whole panel and identified the holdout juror by name.

The most troubling aspect of this case is that the trial court ignored the specter of a perjury prosecution while forcing continued deliberations. The trial court has a duty to respond to jury questions and provide guidance when jurors' threats to one another come to its attention.[8] Here the trial court did nothing to inform the jury that it should not concern itself with perjury or other extraneous issues or that a juror's response to voir dire questions was irrelevant to the current deliberations regarding a sentence. The statements the trial court did make provided little guidance to the jury. The explanation of a foreman's duties was open-ended and did nothing to dispel the threat of a perjury prosecution against juror Fisher. The trial court's response could not have prevented Fisher "from abandon[ing] an honest conviction for reasons other than those based upon the trial or the arguments of other jurors."[9] Fisher's testimony on remand con-

---

[8] See *Edwards v. State*, 233 Ga. 625, 626 (212 SE2d 802) (1975); *United States v. Norton*, 867 F.2d 1354, 1364-1365 (11th Cir. 1989) (finding no coercion where juror wrote note stating he was under duress from other jurors and court advised juror he was not compelled to vote under duress); *People v. Lavender*, 502 N.Y.S.2d 439 (N.Y. App. Div. 1986) (reversing where juror reported assault threat by another juror and trial court failed to respond).

[9] *McMillan v. State*, 253 Ga. 520, 523 (322 SE2d 278) (1984).

firms that Fisher changed her vote not because of the arguments of the other jurors related to the evidence and the applicable law but because of the perjury threat and personal insults.

Additionally, even though the final two notes were the third declaration of a deadlock by the jury, the trial court returned the jury to its deliberations without making an inquiry as to whether the jury had made any progress since its first declaration of an 11-1 split for death. The record reveals that the trial court also failed to consider whether the jurors believed that further deliberations would be of assistance, whether the jury was so exhausted that the minority might be induced to vote for a verdict that they did not truly support, or the length and complexity of the trial.[10] Instead the trial court required further deliberations without any instruction that each juror listen to and consider the views of the others and that a juror should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinions of the other jurors.[11] The failure to include these cautionary statements weighs in favor of a finding of coercion.[12]

Another relevant circumstance is that the jury revealed the nature of its division and the trial court reiterated the precise division in its comments to the jury. In *Brasfield v. United States*,[13] the United States Supreme Court held that it was reversible error for a trial court to ask a jury the nature of its split. A rationale for this rule is that the jury's knowledge of the judge's awareness of the exact division will color the jury's understanding of any of the judge's instructions.[14] This danger is present even when the jury volunteers its division, as in this case.[15] Fisher's testimony on remand is illustrative of this problem. She testified that because the judge kept sending them back for more deliberations when the judge knew the vote was 11-1 for death, she (Fisher) believed the judge wanted her to vote for death.

---

[10] *Romine*, 256 Ga. at 526; *Thornton v. State*, 145 Ga. App. 793, 795 (245 SE2d 22) (1978).

[11] *Romine*, 256 Ga. at 523.

[12] See *United States v. Berroa*, 46 F.3d 1195, 1197 (D.C. Cir. 1995) (instructing jury that a juror should not surrender honest convictions is an important element of an "Allen" charge and should not be omitted); *United States v. Spann*, 997 F.2d 1513, 1519 (D.C. Cir. 1993) (Wald, J., concurring) (the "saving grace for the charge was its conscientious, repeated insistence that a juror not surrender an honest conviction"); *Jiminez v. Myers*, 40 F.3d 976, 981 (9th Cir. 1993) (failure to counterbalance questions and comments regarding jury's division with instructions not to surrender sincere convictions supports finding of impermissible coercion).

[13] 272 U.S. 448 (47 SC 135, 71 LE 345) (1926).

[14] See *United States v. Sae-Chua*, 725 F.2d 530, 531 (9th Cir. 1984).

[15] See *Williams v. United States*, 338 F.2d 530, 532-533 (D.C. Cir. 1964) (voluntary disclosure of numerical division).

Another circumstance to consider is that after the court responded to the final two notes, the jury reached its verdict in less than four hours, which included a lunch break. This time period of approximately three hours is not long enough to dispel any concerns regarding coercion, especially in view of the fact that the jury's deliberations for the previous 10½ hours over three days had produced no signs of progress.[16]

Considering the totality of these circumstances, I conclude that the trial court's failure to address directly the threat against the holdout juror coupled with its insistence that the jury continue deliberating without meaningful guidance resulted in a coercive effect and I would reverse and remand for a retrial of the sentencing phase.

I am authorized to state that Chief Justice Benham and Justice Sears join in this dissent.

DECIDED MARCH 15, 1999 —
RECONSIDERATION DENIED APRIL 2, 1999.

*Carlton C. Carter, Tanya Greene, Julian M. Treadaway, Ray B. Gary, Jr.,* for appellant.

*Benjamin F. Smith, District Attorney, Jack E. Mallard, Debra H. Bernes, Nancy I. Jordan, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,* for appellee.

---

[16] Compare *Lowenfield*, 484 U.S. at 240 (fact that jury returned death sentence soon after receiving supplemental instruction suggests the possibility of coercion).