311 Ga. 18
FINAL COPY

S20A1476. STRICKLAND v. THE STATE.

ELLINGTON, Justice.

A Wayne County jury found Jesse Strickland guilty of malice murder and armed robbery in connection with the death of Arthur Westberry.[1] On appeal, Strickland contends that the evidence was insufficient to support the jury's verdicts. He also contends that the trial court erred in denying his motion for new trial because a juror lied during voir dire about her knowledge of the parties, facts, and

---

[1] Westberry was killed on or about July 6, 2016. Strickland was indicted by a Wayne County grand jury for malice murder, felony murder, and armed robbery in connection with Westberry's death. Strickland was tried from July 31 through August 2, 2017, and the jury found him guilty of all charges. On September 7, 2017, the trial court sentenced Strickland to life in prison without parole for malice murder and to a consecutive life sentence for armed robbery. The trial court merged the felony murder count into the malice murder count, although the felony murder count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Strickland filed a timely motion for new trial on September 18, 2017, which he amended on April 18, 2019, and supplemented on September 11, 2019. The trial court denied Strickland's motion for new trial on May 7, 2020. Strickland filed a timely notice of appeal, and the case was docketed to the August 2020 term of this Court and submitted for a decision on the briefs.

witnesses to the case. We affirm.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In July 2016, Westberry lived in Room 119 at the Red Carpet Inn in Jesup. Strickland and his girlfriend, Megan Hubble, lived in Room 124 on the other side of the building. Strickland had known Westberry for several years, and Hubble knew Westberry from her work. The first night Strickland and Hubble moved into the Inn, Hubble asked Westberry for money, and he gave her $100. Hubble testified that when Westberry refused Strickland's request for money on another occasion, Strickland came back to their room and said that he should "go over there, kick in [Westberry's] door[,] and take what he has."

On the evening of July 2, 2016, Hubble went to Screven to visit family and watch fireworks. While Hubble was at the fireworks display, Strickland messaged her that he had "tricked" Westberry into giving him the PIN for his debit card. Strickland also stated that Westberry had agreed to let him borrow his car. He then picked Hubble up in Westberry's car. According to Hubble, Strickland had

2

at least two of Westberry's debit cards.

Hubble testified that, early the following morning, Westberry came to her room to get his car keys from Strickland. Following a verbal exchange that Hubble described as an "altercation," Westberry also retrieved a bag of clothes that Strickland had taken from the car.

During the late evening of July 4, one of Westberry's neighbors, Levada Lewis, heard his car start. Early the following morning, Lewis saw that Westberry's car was parked on the other side of the building and later that morning she saw that Strickland was driving the car.

Shortly after midnight on July 5, Strickland attempted to pay for items at a Jesup Walmart with Westberry's debit card. The card was declined, after which Strickland tried unsuccessfully to withdraw cash from an ATM located in the store. Later that day, Strickland attempted without success to withdraw money at a gas station ATM. Cynthia Kent, the head of housekeeping at the Inn, encountered Westberry when he came to get his mail around noon

on July 5. That was the last time anyone reported seeing Westberry alive.

After midnight on July 6, one of Westberry's neighbors, Tumesha Jackson, saw Strickland pacing back and forth between Jackson's room and Westberry's room. After she woke up around 5:00 a.m., she looked out the window and saw Strickland starting Westberry's car. At around 6:30 that morning, Strickland tried to use Westberry's debit card to buy a meal at McDonald's, but the card was declined and he left without any food. He returned after 8:00 a.m. and purchased a meal with cash. Strickland returned to the Inn, woke up Hubble, and told her that he had obtained Westberry's social security number and date of birth.

Kent testified that, between 9:15 and 9:45 a.m. on July 6, Strickland brought his laundry to housekeeping, that he "waited until he thought I wasn't looking at him and he hurried up to the washing machine to dump the clothes in," and that he arranged the load "until all of the black clothes were on the very top." Later that morning, Strickland called an acquaintance, Brittany Stossmeister,

and asked her if she would be available to cash a check for him. Stossmeister had previously helped Strickland cash checks forged with Westberry's signature. Stossmeister agreed, and Strickland drove in Westberry's car to meet Stossmeister and her father at the Altamaha Federal Credit Union. There, Stossmeister's father cashed the forged check. Strickland also tried to use two of Westberry's debit cards to withdraw money at the credit union's ATM, but the transactions were declined. Strickland showed Stossmeister that he had Westberry's driver's license and social security card. After Stossmeister and Strickland left the credit union, Stossmeister received a text message from Hubble stating, "Call me now. Jesse just killed a man. Cops everywhere, 911, 911, 911, 911."

By late morning on July 6, Jackson had become worried that she had not seen Westberry in two days and that Strickland was driving Westberry's car. She voiced her concerns to the hotel manager, Vivian Deal. When Deal opened the door to Westberry's room, she found Westberry's dead body. Deal called the police at 1:03

5

p.m.

Officers responding to the scene found Westberry lying face down on the floor. The back of his head was matted with blood, and his right hand appeared to have been injured. A metal rod that had been partially covered by shoes, boxes, and a bag was located near the air conditioning unit.

The room was cluttered, and articles of clothing, some spattered with blood, were strewn on the floor. A lamp had been knocked over. Westberry's left pants pocket was gaping open, and blood stains were visible just inside and around the edges of the pocket. An investigating officer testified at trial that a prepared bowl of food at the scene appeared to be "relatively fresh." When Inn employees were later cleaning up Westberry's room, they found his wallet by the wall opposite the door under a clothing rack.

A DNA analysis of the blood found on Westberry's pants pockets and on the metal rod showed that the blood came from Westberry. The medical examiner found 11 lacerations on Westberry's head as well as injuries to his right hand and

6

determined that he died from blunt trauma to his head.

The same afternoon that Westberry's body was discovered, Hubble spoke with Jesup police officers who were investigating the crime. She gave them Strickland's cell phone number. When the officers called the number, Strickland answered and told them he was walking to the A-1 motel. The officers eventually found Strickland and arrested him.

The officers followed the direction from which Strickland had been walking and located Westberry's car. They also recovered Westberry's driver's license, social security card, and two debit cards strewn on the ground by the side of the road. The card numbers matched those of the cards that Strickland had tried to use at the credit union's ATM earlier that day.

Mitchell Carter, Strickland and Hubble's friend, testified that he went to the Inn on the afternoon of July 6 because he had previously agreed to help Strickland repair Hubble's car. By the time Carter arrived, law enforcement officers were on the scene. Carter went to Strickland and Hubble's room, where he found Hubble

crying. Hubble commented to Carter that "they" suspected Strickland of killing someone, but she did not know if he did it. She also told Carter that Strickland had commented that he ought to "beat" and "rob" Westberry, but that Strickland had said that in a joking manner.

According to Carter, Hubble said that Strickland had come into their room earlier in the day and gone into the bathroom, where he stayed quite a while before coming out. Hubble also told Carter that there was a "piece of metal" in a drawer under the television. Hubble later opened the drawer for a GBI agent and showed him what the agent described as a "flat metal bar." An agent tested stains on the bar for blood, but the results were negative. Although no blood was found on the metal bar recovered from Hubble and Strickland's room, the medical examiner testified that it could have inflicted Westberry's injuries.

Strickland testified at trial as follows. He had known Westberry, whom he considered "family," for about ten years. Before Strickland moved into the Inn, Westberry had given him money,

paid for his hotel rooms, allowed him to borrow his car, and provided him with food and cigarettes. After Strickland moved into the Inn, Westberry allowed Strickland to borrow his car to pick up Hubble at the fireworks display on July 2. Westberry gave Strickland his car keys and debit cards on the evening of July 4 after Strickland said he needed Westberry's car to get tools to work on Hubble's car and that he also needed money for food. Strickland was unable to get any cash from the debit cards until the afternoon of July 5, when he transferred money from Westberry's savings to his checking and back and was then able to withdraw $60. He tried to return the car keys and debit cards that same afternoon, and then again around noon on July 6, but Westberry did not answer his door.

Strickland admitted "plundering" Westberry's check book, social security card, and identification from the glove box of Westberry's car. He said that he had previously stolen checks from Westberry's room while Westberry was in the bathroom. Strickland acknowledged that he had forged and cashed several of Westberry's checks with the help of Stossmeister. He also admitted abandoning

9

Westberry's car and throwing Westberry's debit cards, social security card, and driver's license onto the side of the road.

1. Strickland claims that the evidence was insufficient to support his malice murder and armed robbery convictions.[2] The indictment charged that he used a blunt object to rob and ultimately murder Westberry. Strickland argues that his DNA was not found in Westberry's room, including on the metal rod that had Westberry's blood on it. Strickland claims that the forensic evidence was inconsistent with his having killed Westberry with a blunt object and that the remainder of the evidence was both circumstantial and consistent with his innocence.

When this Court evaluates the sufficiency of the evidence as a matter of due process under the Fourteenth Amendment of the United States Constitution, the standard of review is whether a

---

[2] Strickland also contends that the evidence was insufficient as to the felony murder count predicated on armed robbery. However, the felony murder count was vacated by operation of law because Strickland was found guilty of malice murder. See *Lucky v. State*, 286 Ga. 478, 480 (2) (689 SE2d 825) (2010). Thus, Strickland's claim that the evidence was insufficient as to the felony murder count is moot. See *Mills v. State*, 287 Ga. 828, 830 (2) (700 SE2d 544) (2010).

rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). We view the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted).

As a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether alternative hypotheses are reasonable, however, is principally a question for the jury, and this Court will not disturb the jury's finding unless it is insupportable as a matter of law. See *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019).

The evidence, as more fully discussed above, showed that Strickland had a pattern of asking for and stealing money from Westberry, that Strickland became frustrated when he could not get

11

more money, and that Strickland had suggested that he should beat and rob Westberry. Several days before Westberry's death, Strickland told Hubble that he had "tricked" Westberry into giving him his PIN and he then attempted to use Westberry's debit cards. Between the last time Westberry was seen alive and when he was found bludgeoned to death, Strickland was seen pacing in front of Westberry's room, drove Westberry's car, bragged to his girlfriend that he had Westberry's social security number and birth date, spent a long time in the bathroom, furtively washed his clothes, tried unsuccessfully to use Westberry's debit cards, and arranged to cash one of Westberry's checks, which he forged. After Westberry was found dead, Strickland abandoned Westberry's car, threw Westberry's social security card, driver's license, and debit cards on the side of the road, and began walking toward a motel other than the one where he was staying.

Strickland argues that the State failed to come forward with DNA or other forensic evidence connecting him to the crimes, particularly his use of a blunt object, but the forensic evidence did

12

not exclude Strickland as the perpetrator. "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Jackson v. State*, 307 Ga. 770, 772 (838 SE2d 246) (2020) (citation and punctuation omitted). Strickland also posits that he had no incentive to stop the flow of resources from Westberry by killing him. The jury was not required to conclude, however, that Strickland would not have killed Westberry even if it was not in his financial interest to do so. The evidence was sufficient to exclude every reasonable hypothesis other than Strickland's guilt, see OCGA § 24-14-6, and for a rational trier of fact to find beyond a reasonable doubt that Strickland was guilty of the crimes for which he was convicted. See *Jackson*, 443 U. S. at 319 (III).

2. After the hearing on his amended motion for new trial, Strickland filed a supplement to that motion to which he attached 16 text messages that were exchanged after the trial between juror

E. H. and Strickland's girlfriend, Hubble.[3] Strickland argued to the trial court that the text messages showed that E. H. had failed to acknowledge during voir dire that she knew Strickland and that she knew about the case. Strickland did not provide affidavits from Hubble or E. H., nor was any testimony later obtained from them. In its response, the State did not contest the authenticity of the text messages but contended that they failed to support the grant of a new trial.

The trial court subsequently denied Strickland's amended motion for new trial, as supplemented with the text messages. The trial court concluded that the text messages suggested that E. H. was acquainted with Strickland, Hubble, and witness Carter. The trial court also found, however, that the record failed to show that E. H. acted improperly in her service as a juror, that she held any preconception of Strickland's innocence or guilt, or that she showed any bias toward Strickland. On appeal, Strickland claims that the

---

[3] The trial court found that the text messages, which indicate the month but not the year that they were sent, were exchanged in either March 2018 or March 2019. Strickland's trial ended in August 2017.

trial court erred in denying his motion because during voir dire juror E. H. intentionally lied about her knowledge of the parties, facts, and witnesses to the case.

The record shows that during voir dire, the judge asked the potential jurors to raise their hands if any of them had formed an opinion about the guilt or innocence of the accused, if any of them were prejudiced or biased for or against the accused, and if any of them had read or heard about the case. E. H. did not raise her hand in response. The prosecutor then asked, among other questions, if any of the potential jurors "know [Strickland], know who he is, know of him, know his family . . . from any source." E. H. did not respond to the question.

In the text messages later provided to the trial court, E. H. expressed surprise to Hubble that Strickland was not given a lie detector test. Hubble responded that Strickland had passed a lie detector test and that Carter had made false statements during the investigation and "changed [his statements] every time[.]" Hubble also referenced "300 pages" that were never included in evidence,

among other things. E. H. questioned why the police did not go after Carter instead of Strickland. In one text, Hubble stated that E. H. had "been in" Hubble's Facebook "since it's happened," and "that's already a mistrial [be]cause [you] had knowledge of the case already," but there is no response by E. H. in the materials submitted by Strickland.

Strickland is not entitled to a new trial solely because a juror gave an incorrect response during voir dire; rather, "to secure a new trial . . . , the defendant must show that the juror failed to answer the question truthfully and that a correct response would have been a valid basis for a challenge for cause." *Sears v. State*, 270 Ga. 834, 840 (2) (514 SE2d 426) (1999). See *Gardiner v. State*, 264 Ga. 329, 333 (3) (444 SE2d 300) (1994) (same). "The determinative question is whether there exists bias on the part of the juror which results in prejudice to the defendant." *Green v. State*, 295 Ga. 108, 110 (2) (757 SE2d 856) (2014).

Assuming that E. H. had been familiar with Strickland, Hubble, and Carter, or any of them, at the time of trial, Strickland

16

has not shown that if she had responded truthfully during voir dire, such familiarity would have required her dismissal for cause. "A juror's knowledge of, or non-familial relationship with, a witness, attorney, or party provides a basis for disqualification only if it is shown that it has resulted in the juror having a fixed opinion of the accused's guilt or innocence or a bias for or against the accused." *Green,* 295 Ga. at 111 (2). As the trial court found, Strickland has not shown that E. H. had such a fixed opinion or bias for or against Strickland. To the contrary, E. H.'s texts are consistent with her having voted to convict on the basis of the evidence presented at trial, despite any familiarity with Strickland or the witnesses, and Strickland presented no other evidence that E. H. was biased against him at the time of trial. Accordingly, we see no error.

*Judgment affirmed. All the Justices concur.*

Decided March 1, 2021.

Murder. Wayne Superior Court. Before Judge Kelley.

*Richard O. Allen*, for appellant.

*Jacquelyn L. Johnson, District Attorney, Elizabeth Rosenwasser, Thomas E. Buscemi, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.